# BRIDGET CULLINANE v. JENNIE GRANT et al., Appellants.

### Division One, June 16, 1922.

1. **VOLUNTARY DEEDS: Revocation.**  Fully executed deeds of gift cannot be cancelled on the mere ground that they were not based on a monetary consideration.  If valid at all, they cannot be revoked unless adequate reason for such revocation is established by the evidence.

2. ————: **Undue Influence: Parent and Child.**  The relationship of parent and child does not in ·itself raise any presumption against the validity of fully executed deeds of gift.

3. ————: ————: ————: **Fiduciary Relation: Substitution· of Deeds for Will: Fraud.**  An allegation that an outright fraud was practiced upon the mother, in that deeds were substituted by the grantee and their draftsman and his assistant for a will the mother says she thought she was signing, and that her inability to read made the success of the fraud possible, negatives the idea that any relationship between the mother and grantee induced the mother to sign the deeds conveying property.  Such deception is not evidence that undue influence was exercised upon the mother to execute the deeds, but only of fraud.

4. ————: **Substitution of Deeds for Will: Fraud: Evidence.**  The evidence in this case is overwhelming that the mother did sign the

Cullinane v. Grant.

deeds conveying her property to her daughter; her testimony that she thought she was signing a will when she signed them is clearly disproved; the testimony is clear that when she signed the deeds she knew what she was doing and understood that she was conveying the property to her daughter; and therefore her act was voluntary, and she was not deceived into signing deeds which she did not know were deeds and did not intend to sign.

5. ————: **Dominant Influence of Son.** Where one of the grantor's sons (Joseph) had on different occasions appropriated money of his employer and the other (Michael) was not self-supporting, and all three had lived in the same house with a married daughter, who was the stay and strong support of the home, and after the daughter and mother repaid money which Joseph had embezzled and thereby saved him from prison, and the mother, becoming much worried because of his misconduct and to a less extent by the attitude of Michael, began to talk of conveying all her property to her daughter, saying she was getting old and the daughter would take care of her, and after Joseph had gone away she went to a lawyer's office and signed the deeds in suit, one of which, by the daughter's request, was re-written so as to reserve a life estate to the mother, and four years later Michael, still residing in the same apartment with the mother and daughter, had a deed prepared re-conveying the property to the mother, and upon the daughter's refusal to sign it, caused a suit to be instituted in the mother's name for a cancellation of the deeds, alleging undue influence and fraud, and at the trial it appears that some one had induced the good and pious old mother, certainly not the daughter, to deny the authenticity of her signature to the deeds, which it is indubitably shown she did sign, and to deny that she visited the lawyer's office more than once, when it is clear she had been there on three or more occasions, and in other respects to bring her testimony into conflict with proven facts, the natural conclusion is that another, stronger than herself, had exercised the influence that induced the mother to prosecute the suit against the daughter to cancel deeds which she knowingly and voluntarily made, and that Michael was the dominant force; and there being no evidence of the mother's incapacity or of the exercise of undue influence at the time the deeds were made, and the testimony showing that the life estate she retained has a rental value of sixty dollars per month, in addition to the apartment in which she, the daughter and Michael reside, and that she has several hundred dollars in cash, the judgment cancelling the deeds is reversed.

Appeal from St. Louis City Circuit Court.—*Hon. Karl Kimmel,* Judge.

Reversed.

*Rassieur, Kammerer & Rassieur* for appellants.

(1) Where a gift *inter vivos* has been perfected, that is, where nothing more is.to be done to vest the title in the donee, such gift can no more be revoked by the donor than a sale, or any other executed contract. 20 Cyc. 1192, 1193, 1212; Meyer v. Koehring, 129 Mo. 15, 25; Doherty v. Noble, 138 Mo. 25, 32. (2) Whether the grantor possessed mental capacity sufficient to enable her to make the deeds, should be determined by the rule applicable to wills, and not by the rule applicable· to contracts. The deeds in controversy were made as gifts, not as contracts. Jones v. Thomas, 218 Mo. 508, 538; Chadwell v. Reed, 198 Mo. 359, 379; Richardson · v. Smart, 152 Mo. 623; McFarland v. Brown, 193 S. W. ·804; Nicholson v. Duff, 189 Mo. App. 57; Cutler v. Zollinger, 117 Mo. 101. (3) The mere fact that the relationship of parent and child was shown to have existed between the donor and the donee, was not sufficient to cast a doubt upon the transaction, even though it was also shown that the daughter attended to a part of her mother's business. Circumstances must be shown from which the conclusion can reasonably be drawn that the daughter had, and actually exercised, an influence over her mother such as amounted to over-persuasion, coercion or force, destroying her free agency and will power. McKissock v. Groom, 148 Mo. 467; Tibbe v. Kamp,.154 Mo. 579; Sehr v. Lindemann, 153 Mo. 289; Teckenbrock v. McLaughlin, 209 Mo. 551; Goodman v. Griffith, 238 Mo. 719. (4) There is no presumption against a voluntary conveyance from a parent to a child; nor is the natural esteem and affection which ordinarily characterizes that relation sufficient to constitute a confidential relation, such as would cast the burden of proof upon the donee. Bonsal v. Randall, 192 Mo. 531; Doherty v. Noble, 138 Mo. 32; McKinney v. Hensley, 74 Mo. 332;

Hamilton v. Armstrong, 120 Mo. 615. (5) Nor did the fact that the daughter attended to a part of her mother's business affairs create a fiduciary or confidential relation, such as would cast upon the daughter the burden of proving that the conveyances were the free and voluntary act of her mother. Winn v. Grier, 217 Mo. 460; Huffman v. Huffman, 217 Mo. 193. (6) There is no proof in this case that a confidential relation existed between the grantor and the grantee, and the burden of proof was therefore upon the plaintiff. Studybaker v. Cofield, 159 Mo. 612; Campbell v. Carlisle, 162 Mo. 644; Doherty v. Gilmore, 136 Mo. 419; Teckenbrock v. McLaughlin, 209 Mo. 533. (7) But even though a confidential relation is shown, the only effect of such showing is to cast the burden of proof upon the donee of establishing that the transaction was the free and voluntary act of the donor and free from fraud; the presumption against the gift is one of law only, and may be rebutted and overcome by proof. Huffman v. Huffman, 217 Mo. 194; Goodman v. Griffith, 238 Mo. 719; Kirschner v. Kirschner, 113 Mo. 297; McDermeitt v. Keesler, 240 Mo. 288. (8) The trial court erred in refusing to admit or consider evidence respecting the mental capacity of the grantor, for this was a vital and material issue in the case. Jones v. Thomas, 218 Mo. 508; Chadwell v. Reed, 198 Mo. 359; Cutler v. Zollinger, 117 Mo. 92.

*R. M. Nichols* for respondent.

(1) The testimony, showing that in August, 1914, when the deeds were made to her, Mrs. Grant collected the rents, paid taxes, insurance and repairs, negotiated and paid loans, became custodian of the moneys and valuable papers of her mother, established a strong fiduciary relation with her mother. Ryan v. Ryan, 174 Mo. 279; Cornet v. Cornet, 248 Mo. 235. (2) The circumstance of Mrs. Cullinane's advanced age; her in-

ability to read; her difficulty of seeing; her want of knowledge of the difference between a will and a deed; her perfect confidence in her daughter at the time she supposed she was executing her will; with this fiduciary relation existing between her and her daughter, the law should presume that the two deeds were the result of fraud and undue influence. Cadwallder v. West, 48 Mo. 483; Street v. Gross, 62 Mo. 228; Bradshaw v. Yates, 67 Mo. 228; Lins v. Lenhardt, 127 Mo. 271; Martin v. Baker, 135 Mo. 495; Jones v. Belshe, 238 Mo. 524; Kincer v. Kincer, 246 Mo. 437; Long v. Long, 192 S. W. 948; Parker v. O'Brien, 181 Mo. App. 496. (3) The explanation that the deeds were not the result of undue influence; that they were made to prevent a contest of the will of 1911 in appellant's favor, has been held insufficient to rebut the presumption. Kincer v. Kincer, 246 Mo. 432. (4) The law requires the higher degree of intellectual standard to make a contract than to make a will. The two deeds sought to be set aside were contracts, whether they be looked upon in the light of a deed of gift, or a sale with a consideration expressed. Martin v. Baker, 135 Mo. 504; Ennis v. Burnham, 159 Mo. 518; Jones v. Thomas, 218 Mo. 536.

JAMES T. BLAIR, J.—Respondent brought this suit to cancel two deeds in which she and her daughter, appellant Jennie Grant, were respectively named as grantor and grantee. The trial court ordered the deeds canceled, and this appeal followed. When filed, the petition contained two counts. The first sought the cancellation of the deeds in question, and the second asked an accounting of rents. The second count, by leave, was dismissed without prejudice while the cause was under advisement in the trial court.

The count of the petition upon which the judgment rests alleges that respondent formerly owned certain described property in the city of St. Louis; that in 1914 respondent was and long had been "old, infirm, partially blind and deaf and unable to read or write, and

by reason thereof was at said time incapacitated from properly attending to her business; that the defendant Jennie Grant is plaintiff's daughter and has for many years acted as her agent and confidential advisor in all business matters appertaining to her property and acted as custodian of her papers and moneys accruing from her said property;'' that in September, 1914, respondent ''became desirous of making'' her last will by which she ''would devise and bequeath her property to her children'' and ''to that end and purpose consulted her daughter, the defendant Jennie Grant, and that the said Jennie Grant, fraudulently taking advantage of her infirmity and incapacity as aforesaid, procured a scrivener to draw up two instruments in writing, one dated September 30, 1914, and the other dated October 24, 1914, which said instruments in writing plaintiff has since said dates ascertained have the legal effect of grants or deeds of the above described property, conveying to defendant Jennie Grant the fee in said property, reserving, however, in the one dated October 24, 1914, to the plaintiff herein, a life estate in the property therein described, and that the defendant Jennie Grant did then and there induce the plaintiff to sign the said instruments in writing, representing and stating to plaintiff at the time that the said instruments in writing constituted and were in legal effect the last will and testament of the plaintiff; that, relying upon said representations, the plaintiff was induced by said defendant without any consideration therefor and in entire ignorance of the nature of said instruments which she was executing, to sign, seal and deliver said instruments to the defendant Jennie Grant, under the fraudulent representations as aforesaid, and that the defendant now holds the same and has placed the same of record  .  .  .  and the said defendant is now claiming the remainder in fee in said real estate.''

It is also alleged that after discovering the nature of the instruments in question respondent demanded a reconveyance, which was refused; that the conveyances

are void. The prayer is for cancellation of the deeds and revestiture of title. The answer admits that appellants are husband and wife; specifically denies the allegations of the petition, and pleads the facts which appellants contend show the free and voluntary execution of the deeds and their full validity. By way of reply a general denial was filed.

Respondent's husband died in 1901. She was left with three children, appellant Jennie Grant, Joseph and William, who is known as Bud. There was $7,000 insurance on the life of the father, and after he died this was collected. One thousand of this was used on the residence in which the family lived on Cook Avenue, and most of the remainder was used in aiding in the erection of an apartment on a lot on Cabanne Avenue. Six thousand dollars were borrowed on this property, and respondent executed the necessary notes and deeds of trust in 1908. Prior to this time she, or Joseph, for her, had collected the rents on other property she owned. Sometimes Mrs. Grant made collections. There was another policy on the life of the husband for $3,000, and this had been taken at the suggestion of Mrs. Grant. Mr. Cullinane desired that this money be given to Mrs. Grant, and respondent carried out this wish. In 1904, during the World's Fair at St. Louis, Mrs. Grant kept numerous roomers and made about $2,000 in this manner. While the rooms she used were in respondent's house where the family lived, the furniture employed was that of Mrs. Grant, and there seems to be no doubt that she did practically all the work which the keeping of these roomers entailed, nor any that the money which was then earned was conceded to be hers. The reputation given the sons by this record is not the best. Joseph was in trouble several times as a result of collections made for employers and ensuing failures to account therefor. Bud paid board usually, but does not seem to have been self-supporting. The $2,000 referred to was, with Mrs. Grant's consent, given by respondent to the sons, and, in consideration thereof, a small property on Finney Avenue was conveyed to Mrs.

Grant by respondent. Sometime after the father's death an account was opened in the Mississippi Valley Trust Company in the names, jointly, of respondent and Mrs. Grant. It was arranged that either might draw therefrom on her personal check. Respondent did not draw any checks thereon in her name. Into this account went the rents from the Cabanne Avenue property and from the Cook Avenue house not occupied by the family. The record also shows that Mr. Grant's salary was treated as part of the common fund. Out of this account came the repairs, taxes and insurance and payments of interest and on the principal of the loans on the properties. A joint deposit box was also kept rented. Respondent had several hundred dollars in cash which she kept about her. She lived with the Grants and ate at their table. Bud also lived there. The family life seems to have been pleasant except for the occasional troubles of Joseph and, perhaps, the tendency of Bud to attempt to dominate, at times. As loans became due respondent executed renewal or extension notes for balances unpaid. In 1911 respondent made her will. The testimony is that by this she gave all her property to Mrs. Grant. The appellants offered to introduce this will, but respondent's counsel and the court deemed it unnecessary. The testimony as to the disposition it made of the property was not denied. In the summer of 1914 Joseph got into another difficulty of the kind already indicated. It appears that Mrs. Grant was advised to let him take the consequences. Nevertheless, she and respondent repaid the money Joseph had embezzled, and it seems this was all that was necessary to be done to save him from prison. He then made up his mind to go to Chicago. In the meantime he had collected the purchase price of ten feet of ground respondent had sold off the Cabanne Avenue lot and had kept it. Respondent was considerably worried by Joseph's misdoings and to a less, extent by the attitude and conduct of Bud. She began to talk of conveying all her property to Mrs. Grant. In a conversation which Mrs. Grant testified was in respondent's presence, which testimony was

not denied by her, the matter was discussed with Joseph and Bud.    After they disclosed their attitude regarding such a conveyance, Mrs. Grant asked them if they were willing to put their view in writing.    They agreed to do so and signed the following.    "August 28, 1914.    We are willing to 'have my mother do just. as she wishes about her property in regards to giving it to my sister as it is surely justly due her.    Michael W. Cullinane, Joseph J. Cullinane.''    Michael, or Bud, admitted the signature was his, but denied the writing was on it when he wrote his name on the paper.    Joseph was not called to contradict appellant's evidence concerning the signing of the paper.    Bud said he didn't remember any conversation in which he and his mother and sister and brother discussed a transfer by the mother of the property to his sister; that if it had occurred he "possibly would remember."    Respondent did not specifically deny that this conversation occurred.    Bud's testimony is in some other respects unsatisfactory.

September 30, 1914, Mr. McMenamy, who had drawn respondent's will in 1911 and had negotiated the loans, and extension and renewals thereof, on her property, prepared, according to directions he received through Mrs. Grant, a deed from respondent to Mrs. Grant whereby respondent conveyed to the latter the Cabanne Avenue property.    On October 2, 1914, respondent and Mrs. Grant went to Mr. McMenamy's office, and the deed was brought in and read to her.    According to Mr. McMenamy and his stenographer and Mrs. Grant, respondent fully understood what she was doing.    The deed was explained to respondent and she assented and said that her intent was to give the property to her daughter, Mrs. Grant; that she had been a good girl and had taken care of the property. She then signed and acknowledged the deed and delivered it. Subsequently respondent seems to have made up her mind to make a like disposition of the Cook Avenue property. On October 24, 1914, she again went with her daughter to Mr. McMenamy's office where a deed had already been prepared in anticipation of her coming.    Mrs.

Grant had previously visited the office and told Mc-Menamy that her mother had determined to convey to her the Cook Avenue property outright and had asked that McMenamy be notified to prepare a deed to that end. Mrs. Grant told Mr. McMenamy she didn't want her mother to do that; that she wanted her mother to retain a life estate in this property, which consisted of two houses or apartments. McMenamy prepared a deed with the reservation of the life estate incorporated therein. When respondent came the deed was read to her. When the clause was reached which reserved the life estate respondent objected to it and said she wanted to give it "all to Jennie," Mrs. Grant. Mrs. Grant told her no, that she ought to retain control of the property. Thereafter respondent acceded to this and signed, acknowledged and delivered the deed. The testimony of McMenamy, Miss Friel, his stenographer, and Mrs. Grant is clear on these matters. They say respondent was able to and did understand the whole matter; that she was neither blind, nor deaf, nor infirm, in the sense that her ability to understand was affected; that there was no mention or question of the making of a will; that the matter of making a will was not referred to. The property was incumbered for considerable amounts. It appeared from the testimony of other witnesses, as well, that respondent was not at all blind, or deaf, and that she could and did read newspapers and was able to understand the meaning of a deed. It is admitted by her counsel that there is no contention or evidence that she was mentally incapable, and the very strong preponderance of the evidence is that she was and is an intelligent and rather sprightly woman for her years. She was probobly a little more than seventy years old when the deeds were made in 1914. There is some conflict in the evidence on this point.

Several women neighbors of respondent testified that soon after the deeds in question were executed and delivered respondent told them she had conveyed her prop-

erty to her daughter.  One of these had seen the deeds listed among the transfers recorded, and on meeting respondent remarked that she noted respondent had deeded the properties "to Jennie."  She said respondent replied, "Yes; who has a better right to it than Jennie?" Another testified that respondent broached the subject and in the conversation said that she had "turned everything over to Jennie;" that she was "getting too old now, and Jennie will take care of me, and the boys will not take care of the property."  Thomas Cullinane, a brother-in-law of respondent, testified she told him she had "transferred the property to Jennie;" said that "she was so worried about the way her son Joe was acting, that he was worrying the life out of her, borrowing money from different parties and coming back and telling her—she was worried about it, but felt easier now she had the property turned over to Jennie."

In March, 1918, Bud Cullinane caused a deed to be prepared for the purpose of having Mrs. Grant re-transfer the property in question to respondent.  He says he knew nothing about the deed of 1914 until he "happened to look over the records in the books there" and saw his "sister's name on every piece of property owned by" his mother; that then he had "a man look them up and he said it had all been conveyed over to" Mrs. Grant. All this time he had lived in the house with his mother and sister.  He says neither of them had mentioned to him the deeds in question.  After he made this discovery, he says, he caused a deed to be prepared for the re-transfer of the property.  He did not consult either his mother or sister about it.  The mother did not authorize it.  Thereafter, he took this deed and, he says, in the presence of Mrs. Grant and her husband, asked his mother if "it was her wishes to put all the property in" Mrs. Grant's name.  He says his mother replied, "No;" that he then told her she had been "double-crossed;" that she "didn't own the house she had been living in;" didn't "own a brick in the city."  He says Mrs. Grant then said the property was in her mother's name, and he

then denied that statement and left the room. He says no further conversation took place at that time; that later, the same evening, he asked his sister to sign the deed he had caused to be prepared, and she refused. He then caused this suit to be instituted. While the testimony is a little confused, the preponderance of it shows that Bud did not consult his mother about bringing the suit; that he did not take her to see the attorney who instituted it until after it had been begun. Bud denies that he ever heard that his mother intended to convey the property to Mrs. Grant, and denies that he ever heard of the deeds involved in this case until his casual discovery at the City Hall. With respect to the paper purporting to be signed by him and Joseph on August 28, 1914, he first said the signature resembled his signature "a little." On further questioning he admitted the signature "looks like" his. Pressed further, he stated unqualifiedly that the signature was his, but denied that the paper had "that writing on it" when he signed it. He said he couldn't explain why he had the deed for retransfer drawn before talking to his mother about it. Respondent seems to have found out about the suit by seeing the summons when it was served on her daughter. But did not inform Joseph of his discovery or of the bringing of the suit. Joseph did not learn of the suit until it had been begun.

Respondent testified. She said she was still living in the house with her daughter, Mrs. Grant, and that she still ate at her daughter's table; that Bud lived at the same place, but did not take his meals there. She denied that the signature to the deeds of October 2 (September 30) and October 24, 1914, were made by her; admitted she signed something on the dates and at the place mentioned, but said she thought it was a will. She also denied signing the deeds of trust, and notes thereby secured, which were in evidence, though she knew money was borrowed on the properties while they stood in her name. With respect to the will she said she thought she was making at McMenamy's office she first said her in-

tent was to divide her property among the three children. She then testified that she intended by the instruments signed at McMenamy's office merely to turn the property over to her daughter, Mrs. Grant, so she could look after it, and that she, respondent, later could make up her mind what property she would give each child; that she did not know the difference between a will and a deed and could "not read writing; . . . could read anything in large print, but could not read small print." She said she did not know that she had conveyed the property to Mrs. Grant until Bud told her in March, 1918, in the conversation to which he testified; that was the first time she knew she "wasn't the owner of a bit of property." She testified that Mr. Grant, after the conversation Bud precipitated in March, 1918, asked her if the property was re-conveyed to her whether she would take an oath that she would give the property back to her daughter "when things would cool off or calm down," and that she refused to agree to this. She said her daughter had looked after the property for her since her husband's death. This is qualified by her testimony that Joseph looked after the building of the Cabanne Avenue property and collected the first month's rent. She said she never asked her daughter about the disposition made of the rents collected and was never told. She asked about collections of rent but about nothing else. She did not assert that her daughter had done anything wrong about the rents, but said she got no money from them. She never inquired about the payments made on the incumbrances on the properties and said she knew nothing about expenditures for repairs and the like. She first denied that she signed notes and deeds of trust on the properties, and then admitted knowledge of their existence and said she didn't remember whether she had to "sign papers" when loans were secured, and didn't "remember signing any notes for any money." Never more than once "in her memory" did she go to McMenamy's office to make a will.

I.   The theory of the trial court was that the fact that the deeds were not based upon a money consideration entitled respondent to have them canceled.   This eliminates any question of deference to a finding on the facts, since it shows no such finding was made.

*Deference to Chancellor.*

II.   The deeds in question are fully executed deeds of gift, if valid at all, and cannot be revoked unless an adequate reason for such revocation is shown by the evidence.   [Meyer v. Koehring, 129 Mo. l. c. 25.]

*Revocation.*

III.   The fact of the relationship of parent and child does not in itself raise any presumption against the validity of the deeds.   [Doherty v. Noble, 138 Mo. l. c. 32.]

*Undue Influence.*

IV.   While the petition sets up facts which seem designed to show a fiduciary relationship between respondent and her daughter, there is neither pleading nor evidence that respondent was unduly influenced, in the ordinary sense, to execute the deeds.   The petition pleads and respondent's theory is that respondent was deceived by false representations and induced to sign deeds when she thought she was signing a will.   There is no pretence that she was induced by undue influence knowingly to do something which it was not her own will to do.   The contention is that her daughter and the draftsman and his assistant substituted for the will which respondent says she thought she was signing, the deeds in question in this case.   Respondent's petition charges that an outright fraud was practiced upon her and that her asserted inability to read made the success of this fraud possible.   This negatives the idea that any relationship between respondent and her daughter induced her to sign the deeds.

*Fiduciary Relation.*

V.   The issue is whether deeds were fraudulently substituted for a will and respondent deceived into sign-

ing deeds when she intended to and thought she was signing a will. While respondent denies she signed the deeds, this denial contradicts her petition, and the evidence is overwhelming that she did sign the deeds. Her testimony that she thought she was signing a will is clearly disproved. That she had reason for the deeds to her daughter is shown by the evidence. That she had this reason in mind is proved by a preponderance of the testimony. That she contemplated acting upon it is proved by the writing signed by Bud and Joseph, of which she knew, and confirmed by her statements, after the fact, of what she had done, which are shown to have been made to a number of disinterested witnesses. The testimony concerning what happened at the time the deeds were signed makes it clear that respondent then knew what she was doing and understood that she was conveying the property to her daughter. It is clear from the record that her act was voluntary and that she was not deceived into signing deeds which she did not know were deeds and did not intend to sign.

**Fraud Disproved.**

VI. So far as influence over her is concerned, she has been prosecuting this suit against her daughter to cancel deeds she knowingly made. Meanwhile she and the daughter and Bud, who induced respondent to maintain this suit, have all been living in the same house, as they had lived for years before, and, it seems, as Joseph had lived until September, 1914. If a comparison of influences can be made it would seem that Bud is in the dominant position. The thing which gives this its principal force is that someone, certainly not the daughter, has induced respondent to deny the authenticity of her signatures to documents which it is indubitably shown she did sign and to deny that she visited McMenamy's office more than once, when it is clear she had been there on three or more occasions, and, in other respects, to bring her testimony into conflict with proved facts. That

**Dominant Influence.**

she voluntarily would do this unless driven to it by a personality whose domination she could not resist, cannot be believed when her whole testimony is read. She is instinctively a good and pious woman, and the only rational explanation is that another will, stronger than her own, has brought about what has been done. It is beyond question that her counsel is not responsible for this. If there were no other reason, lawyers do not attempt deliberately to disprove their pleadings. The responsibility seems to rest upon Bud Cullinane who really instituted and controls this suit.

VII.   There is no claim of lack of mental capacity, and the testimony shows that in 1914 respondent was a vigorous and intelligent woman. This is not a case in which a parent has stripped herself of all her property. Respondent has retained a life estate in property worth nearly sixty dollars per month. In one apartment she and her daughter and Bud live. The other is rented. She has other means in the way of some several hundreds of dollars in cash. The record does not show the invalidity of the deeds in question. On the contrary, it disproves the charge made in the petition.

Incapacity: Other Property.

The judgment is reversed and the cause remanded with directions to enter judgment for appellants. *Graves* and *Elder, JJ.,* concur.