Fred W. Klaber, Administrator of the Estate of Clara C. Austin, Appellant, v. Unity School of Christianity, a Corporation.— 51 S. W. (2d) 30.

Division One, June 13, 1932.

*Frank P. Barker, Leland Hazard* and *Winger, Reeder, Barker, Gumbriner & Hazard* for appellant.

856

*Otto Bayse* and *Madden, Freeman & Madden* for respondent.

ATWOOD, J.—This case comes to the writer on reassignment. It is a suit in equity to set aside a contract dated April 4, 1924, between Clara C. Austin and Unity School of Christianity, a corporation, purporting to convey to said corporation $11,100 in bonds and $900 in cash, and for the recovery of said bonds and cash. Clara C. Austin died September 15, 1924, and this suit was instituted by her administrator who appealed from a general finding and judgment for defendant.

The grounds of attack indicated in plaintiff's petition are mental incapacity of Clara C. Austin, and undue influence and fraud exercised and practiced upon her by the officers and agents of defendant Unity School of Christianity. Defendant's answer was a general denial.

In presenting this appeal counsel for the administrator frankly say that we need not find that Clara C. Austin was *non compos mentis*, and the fact, if it be a fact, that the evidence shows her mind was weakened is apparently stressed only as "an element going to the establishment of the fiduciary relationship." The points first urged by appellant are that she bore the relationship of confidante and fiduciary to defendant, and, that relationship existing, undue influence is presumed. Plaintiff's pleading with reference to her mental incapacity and the fiduciary relationship is chiefly as follows:

"That on the said 4th day of April, 1924, said Clara C. Austin, was an old woman, more than ninety years of age, weak and frail, in body, and that for some time prior to said date, in addition to the deafness and defect in eyesight as aforesaid she was suffering from infirmities of mind; that her memory had become weakened and fallible, and that her rational processes were impaired and weakened, and that she was unable to exercise sound judgment with respect to her business and financial affairs; that she had consulted the officers and agents of said defendant corporation, and particularly its president, Charles Fillmore, and its treasurer and manager, Lowell Fillmore, with respect to her business and financial

affairs, as well as her bodily and mental infirmities, and had received and accepted advice from said officers of said defendant corporation with respect to her said financial affairs, and with respect to property and business, and that she reposed in them confidence and trust as to each and all of these matters."

Appellant asserts that the relations of doctor and patient and priest and penitent are classical instances of a fiduciary or confidential status, and that the evidence abundantly shows the existence of these relations between defendant and Clara C. Austin at the time the contract in question was executed. Such a relation, however, does not in and of itself prove the existence of a fiduciary status in the sense that a presumption of undue influence necessarily flows therefrom. On this subject Judge VALLIANT, speaking for th's court in Studybaker v. Cofeld, 159 Mo. 596, 612, 613, 61 S. W. 246, said:

"The law is as cautious in defining a fiduc'ary relation in the sense in which we are now using that term as it is in limiting by definition the boundaries within which fraud may be pursued. There are certain techn'cal relations that are readily comprehended as fiduciary, such as guardian and ward, attorney and client, priest and communicant, etc., but there are other relations not falling in either of those specified classes that are in fact fiduciary, and, conversely, it is not every guardian, attorney or priest, *quia eo nomine*, who is to be adjudged to hold a fiduc'ary relation with the party in regard to a particular subject. It is in each case a question of fact. The law regards the real rather than the nominal conditions. The principle is thus stated in 27 Am. and Eng. Ency. of Law, 460: 'The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations that exist whenever one trusts in and relies upon another. The only question is, does such a relation in fact exist?' While the relation of nurse and patient may raise the question, yet it does not in itself answer that question, but the inquiry is still one of fact. Was trust reposed?"

In 25 Corpus Juris, page 1119, in connection with note 41, it is said that this relation "exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith, and with due regard to the interests of the one reposing the confidence."

The burden of proving the existence of such relation between the donor and donee is upon the person asserting it (27 C J. 46), but when the relation is shown an adverse presumption arises and the recipient of the gift has the burden of establishing its absolute fairness. [12 R. C. L. p. 953, sec. 28; n. 6.] In Hall v. Knappenberger, 97 Mo. 509, 511, 11 S. W. 239, cited with approval in Mun-

day v. Knox, 9 S. W. (2d) 960, 966, 321 Mo. 168, and other cases, we said:

"The rule 'stands upon a general principle applying to all the variety of relations in which dominion may be exercised by one person over another.' "

Hence, the donor s state of health and strength of mind may be proper subjects of inquiry in determining whether or not such special trust was reposed in the donee (28 R. C. L. pp. 146, 147, sec. 100, n. 14), and, as already observed, appellant urges these matters for that purpose only. ■ However, the presumption of undue influence arising upon proof of such confidential relation "is at most but one of fact and not of law, and it drops out of the case when evidence to the contrary appears." [Munday et al. v. Knox et al , 9 S. W. (2d) 960, 966, 321 Mo. 168; Bushman v. Barlow, 292 S. W. 1039, 1053, 316 Mo. 916; Goodman v. Griffith, 238 Mo. 706, 719, 142 S. W. 259.]

■ But, it is said there can be no application of the foregoing rule that a presumption of undue influence arises upon proof of the existence of a fiduciary relation unless the gift of the donor goes to the other party in this relation or such other party thereby acquires some beneficial interest therein. [40 Cyc. 1152, 1153, n. 14; Ryan v. Rutledge (Mo. Sup.), 187 S. W. 877; Barkley et al. v. Cemetery Association, 153 Mo. 300, 315, 54 S. W. 482.]

The gift in the instant case was made to defendant corporation, while the fiduciary relation pleaded and sought to be proved was between the donor and the officers and agents of the corporation, particularly Charles Fillmore, Myrtle Fillmore, his wife, and Lowell Fillmore, his son, who were the president, vice-president and treasurer, respectively, of defendant corporation. It appears from the evidence that this corporation was formed in 1914 under the laws of Missouri governing manufacturing and business corporations. Its capital stock then was and still is $5,000, all subscribed and owned by the above named members of the Fillmore family and another son of Charles Fillmore. The purposes and powers stated in the original articles of incorporation are as follows:

"The purposes of this corporation are to establish and maintain a school, institute or college, for the instruction in and the promotion of Christianity and the principles and studies for the intellectual, moral, spiritual and physical development and improvement of mankind, and for the promotion of the harmony, health and happiness of mankind, and to apply such principles and teachings for such purposes, including the treating of diseases and ailments of persons anywhere; and also in connection therewith, to further carry out these objects, this corporation shall have power to establish and maintain a sanitarium for the treatment and healing of diseases and

ailments of persons, and to receive and treat patients; to furnish food and other aids and necessaries recommended by this corporation; to use all lawful and usual methods and means of educating, aiding and treating its students and patients; to provide such instruction and aid to persons who personally attend the courses of study and instruction, as well as to those who are at a distance; to grant diplomas and confer degrees on its students who are deemed proficient and fitted to receive them.

"For the accomplishment of these objects it has power to establish branch organizations; to establish a library or libraries; to print, publish, bind and distribute such books, magazines, papers and other literature as will further carry out the objects of this corporation. To lease suitable buildings and equipment, and to acquire by purchase or gifts such personal and real property as may be necessary to carry out the objects of this corporation; and to receive subscriptions and donations of real and personal property to be applied to the uses and purposes of the corporation; to take, hold and manage real and personal property conveyed to it in trust, the income from which is to be applied to the uses and purposes of this corporation, and to execute such trusts; to mortgage or otherwise encumber any of its property, or to sell and convey the same; to permit the use of any of its property for religious, educational, benevolent, or other lawful purposes."

In 1918 these incorporators and owners of the entire stock executed a declaration of trust stating that they held said stock to be used to carry out the purposes therein expressed, "so that all persons who now are or may hereafter be members and adherents may, while so enrolled and upon proper application, receive the benefits of all the principles and teachings and other help that the School can give;" reserving to themselves and their "successors the right to manage and control the business and properties, and to a reasonable compensation" for their time and services, and to name their successors. In 1921 the articles of association were amended by providing "that no dividends shall ever be declared or paid, but all profits and property of this organization shall be used to carry out the purposes of the organization or some part thereof," and a duly certified copy of such proceedings were filed with the Secretary of State of Missouri. In 1923 said incorporators and owners of stock executed a second declaration of trust disclaiming any right of private property in the stock, and entrusting the same to themselves "and their successors as Trustees for the purpose of voting the same at any and all meetings of said corporation or its successors, the object and purpose of this declaration of trust being, in every lawful way, to perfect and carry on the work in all its branches necessary and proper to be done in carrying out the purposes of said corporation as set forth in its said articles

of association as amended." Charles Fillmore testified that long prior to the making of the gift here in question the incorporators had conveyed all their private property to the corporation and had no private property or means of subsistence except the salaries they voted to themselves as officers of the corporation.

On the foregoing state of the record counsel for respondents say that said members of the Fillmore family were in no sense recipients of the gift, and even if a fiduciary relation existed between them or any of them and the donor, there can be no presumption of undue influence.

In Hegney v. Head, 126 Mo. 619, 629, 29 S. W. 587, the court said:

"How a religious or charitable institution can, of itself, be guilty of fraud or undue influence in the procurement of the execution of a' will we are unable to perceive, but that persons may exercise such influence in its favor is true."

Also, in Barkley v. Cemetery Association, 153 Mo. 300, 315, 54 S. W. 482, the court speaking of this presumption of undue influence said:

"This rule has for its basis some pecuniary benefit to be derived directly or indirectly under the will by the person or church or charity represented by the person by whose influence the testator is i. fluenced to make the will," etc.

According to the evidence the sole support of these officers and agents of defendant corporation consisted of salaries fixed and absolutely controlled by them and paid them by said corporation. which in turn was maintained in a material sense by such gifts as the one here in question. We need not go as far as the holding in the Barkley case, supra, to conclude that they would derive a beneficial interest from this gift that would bring them within the rule if the fiduciary relation actually existed. The fact that they had power to fix and appropriate to themselves the direct or indirect benefits of such a gift, which would have been beyond their reach had th gift gone elsewhere, clearly distingu'shes this case from Ryan v. Rutledge (Mo. Sup.), 187 S. W. 877, cited by respondent.

Recurring to appellant's claim that the existence of a fiduciary relation was well pleaded and proved, we learn from plaintiff's case in chief and defendant's evidence that Clara C. Austin was a native of the State of New York, the year of her birth being variously indicated from 1840 to 1852; received the degree of M. D. from Boston University in the School of Medicine in 1882; was active in the practice of her profession for many years thereafter, during which time for a period of ten years she was physician for the city of Boston; traveled extensively in the United States and made at least one trip abroad; was married to Henry Leach who predeceased her; had no children, her nearest living relatives for some time prior to her death being two nephews, a niece and a grandniece, none of whom were de-

pendent upon her for support; demonstrated business ability in hand-
ling of her own financial affairs; owned residence property in Angola,
New York, worth ten or twelve thousand dollars which she con-
veyed to her nephew Maurice Gale, reserving a life estate therein;
had interest bearing accounts in various banks in the city of Boston
at the time of her death and at various times had accounts in banks
at Angola, New York and St. Louis, Missouri; received an annuity
of $600 from the year 1915 until her death, paid to her under a will
probated in Boston; received money frequently from people to whom
she had rendered professional services; was methodical and exact 'n
her business transactions, but was not inclined to confide in any one
regarding her business affairs; was an intelligent and well informed
woman whose interests extended over a wide range of subjects; h d
been interested in the teaching of Unity for many years; spent two
or three years immediately prior to November, 1919, in Kansas City,
Missouri, living in the vicinity of defendant's headquarters and
school and was in close contact therewith; became a member of the
Society of Silent Unity, one of defendant's departments, in 1917;
in 1918 became a member of Unity Society of Practical Christianity,
a corporation separate from defendant; in July, 1923, she was
ordained a minister and received a certificate from defendant Unity
School of Christianity authorizing her to preach; was a subscriber to
Unity literature and practiced the principles of healing as taught by
defendant.

Some time prior to June 23, 1919, she began lending money to de-
fendant receiving interest bearing notes or bonds in return therefor,
the proceeds of these bonds being used by defendant to extend its
facilities and carry on its work. From time to time she expressed
her desire that defendant have this money to help it go on "with the
good work." Several times she expressed in letters her intention
to give the bonds to defendant so that it would have them and there
would be no trouble at her death. In the summer of 1922 she was
living in rooms reserved in the Angola residence property which she
had given her nephew. That summer she furnished this nephew w'th
money to take her on a trip to California and incidentally to look over
a gold mine in Arizona in which both he and she had become fi-
nancially interested. She did not complete the trip on account of
an automobile break-down early in the journey but she remained
away from Angola until December, 1922. The nephew continued
the journey, stopping off at Kansas City, Missouri, and calling on
defendant's officers. Prior and subsequent thereto Dr. Austin re-
quested defendant's officers to give this nephew no information w'th
reference to any of her money transactions with defendant. From
the early part of 1923 until May of that year she was in New York
City and in the State of Vermont. On April 9, 1923, she wrote de-

fendant that she hoped to come to Unity before long and make her permanent home there, that she was glad to help all she could in the good work and felt "blessed in letting you have all that I can," and she did visit the school in Kansas City in July, 1923. Her subsequent correspondence indicated that she was gathering up her funds and placing them with Unity in accordance with this expressed intention. For some years her sister, the mother of Maurice Gale, had been her chief responsibility. She took care of her in her Angola home. This sister died in January, 1923. There was evidence of more or less friction between Dr. Austin and Maurice Gale's wife resulting in a somewhat unhappy home life when Dr. Austin was at Angola.

It appears from letters of Dr. Austin that she recognized early in 1924 that her health and strength were failing. On February 27, 1924, she wrote Mrs. Fillmore that she had been wanting to tell her just when she would come but wanted another $1000 before she started in order "to make everything ship shape for us both." Her next letter was addressed to Lowell Fillmore under date of March 24, 1924, wherein she asked that all her bonds be put in one bond and said:

"I will leave the bond with you and in case of death you will have no trouble. That will make just $12,000, Twelve Thousand Dollars. I wish Unity to have it to keep up the good work. I am having a little trouble to get people to pay me what they owe me. Please give me some help. I trust the Good Father every time. I had hoped to come on to Unity before this, but I may have to go further East before I come. But everything must be fixed all safe for you all."

Under date of March 27, 1924, defendant's treasurer, Lowell Fillmore, replied to this letter requesting that Dr. Austin send in the bonds and saying "in a few days we will have them arranged as you desire." This letter also stated: "We are sending your letter to Charles Fillmore for further attention." Under date of March 31, 1924, Dr. Austin, addressing the Fillmores as her "Dearly Loved Teachers," advised them that she was offering her Angola residence property for sale at ten thousand dollars and requested them to help her sell it. In this letter she also said: "I am to send another 1000 in a short time then if anything happens to me you have them to help carry on the good work of Unity and I shall feel as though I had lived for some purpose and they were still living." Under the same date she addressed another letter to Lowell Fillmore stating:

"I am glad to send you my Bonds amounting to $11,100 and I will send you the other $900 now very soon and that will make a total of $12,000. Yes, your father wrote me about leaving the bonds with him in case of my death, and then you would have no farther

trouble for you have them. Bless your hearts I wish you to have them to help go on with the good work.''

Under date of April 2, 1924, defendant's treasurer wrote Dr. Austin as follows:

''We beg to acknowledge receipt of your letter of the 24th ult. in reference to your desire to give to Unity the bonds which have heretofore been issued to you, and also an additional amount in cash. We note you desire to receive payments semiannually on the 1st days of January and July in each year.

''The plan suggested in your letter is one that we think would not work out as you desire it. We have therefore prepared an agreement whereby we can pay you an annuity as long as you live in consideration of your giving and delivering to us the bonds and an additional $900 in cash which would then make exactly $12,000. You probably overlooked the fact that one of the bonds is for $1100.

''We are enclosing herewith the forms of contract in duplicate and if they meet with your approval you may sign each of them and return to us together with all the bonds described therein and which you now have, and also $900 in cash. We will then sign each of these copies and forward to you one, keeping one for ourselves.

''We can adjust the matter of payment to you until the 1st day of July next and can send that much to you on July 1st. And thereafter on the 1st day of January and July the amount we would agree to pay you would be $360.

''We find that others desire to make some present disposition of property for our benefit and we have had this form prepared. We trust that it will carry out your wishes fully and in every way meets with your approval.''

The form of contract referred to in the above letter is as follows:

''Know all men by these presents, that I, Clara C. Austin, of Angola, New York, being the owner of the following described personal property now in my possession, to-wit: (Here follows description of bonds and cash aggregating $12,000, the gift here in question), and being desirous of aiding Unity School of Christianity, a corporation of Missouri, in carrying on its work, do hereby and now give, transfer, assign and deliver to said Unity School of Christianity all of the aforesaid bonds and cash, absolutely and unconditionally, and to use the same in any way it may deem best, in consideration of the promise of Unity School of Christianity to pay to me the sum of Three Hundred Sixty dollars ($360) on the first days of January and July in each year, beginning January 1, 1925, at Commerce Trust Company in Kansas City, Missouri, as long as I, the said Clara C. Austin shall live, and no longer. And at my death the said Unity School of Christianity is and shall be at once absolved, and I do now release it as of that time and thereafter, from any obliga-

tion whatsoever to pay any sum thereafter growing out of this transaction. It is the meaning and intention of this instrument that said Unity School of Christianity shall not be obligated to make any such semi-annual payment subsequent to the payment due next before my death.

. "And said Unity School of Christianity does, in consideration of the gift, transfer, assignment, and delivery of said above described bonds and, cash made to it now by said Clara C. Austin, the receipt of which is hereby acknowledged, promise and agree to pay to said Clara C. Austin the sum of Three Hundred Sixty dollars ($360) as an annuity on the first days of January and July of each year beginning January 1, 1925, until the death of said Clara C. Austin as hereinabove provided.

·"In witness whereof, the said·Clara C. Austin has hereunto set her hand, and the said Unity School of Christianity has caused these presents to be signed by its president and the corporate seal to be hereto attached, all on this 4th day of April, 1924.

"In duplicate."

Under date of April 4, 1924, Dr. Austin wrote Lowell Fillmore and Charles Fillmore as follows:

"Yours of April 2nd just at hand and I will sign the papers and send back and will you keep mine until I come.

"And if you will send me the April interest due me $30 (thirty dollars) It will suit me all right.

·"Now I do not wish for one moment for you to think that I am to send you no more money for I *am.*"

This letter bore notation at top under date of April 7, 1924, to the effect that two signed copies of the contract were enclosed.

Under date of April 9, 1924, defendant's treasurer wrote Dr. Austin acknowledging receipt of the signed contract and stating that one copy was being held for her until she arrived and further stating: "We presume you intend to wait until you come to bring the $900. It is all right any way you want to arrange it."

Under date of April 14, 1924, Charles Fillmore wrote to Dr. Austin in part as follows:

"I have before me your letter of March 31, which I see has not been answered, and in which you ask for a thought to help sell your house.

"We have been realizing that in Spirit the one who can best utilize the property is now on the way to take possession of it. Your own comes to you under the Divine Law. . . .

"I feel that you are being resurrected into a new consciousness of life and health and I am rejoicing with you."

Beneath his signature to the letter is the following: "Lowell says he is attending to the Bonds and that our legal adviser Mr. Bayse is putting the whole matter in good shape."

Under date of June 16, Dr. Austin wrote Charles and Lowell Fillmore from Framingham, Massachusetts, in part as follows:

"I enclose 9 nine hundred dollars and with the one hundred you have now will make it twelve thousand. I wish you to keep the papers until I come for if anything happens to me you have them."

Defendant's treasurer acknowledged receipt of this payment on June 20, 1924, and under date of July 2, 1924, he wrote her at Framingham, Massachusetts, in part as follows:

"We take pleasure in sending you our check for $358, being all in the interest due you on your bonds, to July 1, 1924, when the records are being changed. From now on you will receive payments semi-annually for this interest. It will not be as interest any more, as there is to be no bonds, but the semi-annual payment as agreed is to be sent you January and July 1st of each year."

Under date of July 8, 1924, Dr. Austin acknowledged receipt of the above letter and check for $358 and said: "Yes, I think I now understand all the facts of the case and I am so thankful to you that it is all fixed sound and sure and you at Unity are secure in case of my death before I get to you."

Dr. Austin reached Kansas City in the latter part of July or early in August, 1924, and took up her abode at one of defendant's properties called the Annex where she remained until her death. Letters addressed by her to her nephew and other friends at Angola during the latter part of August indicate that she was in failing health. For a time she improved but later grew weaker and passed away September 15, 1924.

Without further digest of or quotation from the voluminous record before us, suffice it to say that the only evidence that Dr. Austin consulted with defendant's officers and agents regarding her financial affairs is found in the communications above noted where she asked the Fillmores to help her in collecting money from individuals who owed her and in getting a buyer for her Angola property. Whether or not she accepted and acted upon the advice given is left to surmise. In 1922 she communicated with them regarding a cataract that was affecting her sight, and later with regard to other physical infirmities, but there is evidence that she also consulted regular physicians. She was in failing health early in 1924, and, except for an occasional respite, this condition progressed until her demise in the following September, but without evidencing mental incapacity prior to or soon after the contract in question was executed. It is doubtful whether a fiduciary relation was shown strictly within the above quoted pleading of same, but the evidence in-

dubitably shows that Dr. Austin was a devoted believer in the faith and practice fostered by defendant, that Charles, Myrtle and Lowell Fillmore were her spiritual teachers, associates and advisers therein, and that she reposed implicit trust and confidence in them. The petition as a whole, broadly interpreted, supports such proof, and from it we conclude that a confidential relation was shown. [6] However, the facts disclosed overcome the presumption of undue influence and lead us to the further conclusion that Dr. Austin's gift was the natural and fair consummation of her determination of some years standing to make a substantial bestowal of property upon defendant.

Appellant next contends that "the transfer was procured by affirmative acts of fraud and undue influence." According to the pleadings plaintiffs' reliance as to undue influence was upon such presumption as would arise upon proof of a fiduciary relation, which we have already held was overcome by the facts in evidence. There was neither pleading nor proof that Dr. Austin was unduly influenced, in the ordinary sense, to execute the contract dated April 4, 1924. The charge was that defendant "by the wrongful use of the influence and control exercised over said deceased through the officers and agents of said corporation, wrongfully, fraudulently and deceitfully induced said deceased to execute and deliver to said corporation a certain contract," etc. This allegation is one of fraud and deceit, and inconsistent with the presumption of undue influence arising from a fiduciary relation. [Cullinane v. Grant, 242 S. W. 903, 907, 294 Mo. 423.]

General averments of fraud are insufficient. Specific acts and circumstances constituting fraud must be stated, and the facts so stated must be sufficient in themselves to show that conduct complained of was fraudulent. [Dickey v. Volker, 321 Mo. 235, 11 S. W. (2d) 278, 287.]

The first act pleaded under this charge is that of defendant in preparing and sending to Dr. Austin an annuity contract embracing an outright gift of the bonds and money, instead of converting all into a single bond for $12,000 and retaining same until and after her death, as requested in her letter of March 24, 1924. This letter expressed a clear intention on her part to give this property to defendant and expressly cautioned the Fillmores that "everything must be fixed up all safe for you all." When the Fillmores learned that the plan suggested in Dr. Austin's letter would not effectuate her clearly expressed purpose of making defendant an absolute gift of the property, ordinary good faith required them to so advise her and submit a plan that would. This they did by having prepared and sent to her this contract which covered the situation in plain terms that any person of average intelligence could easily understand. It

was accompanied by a letter clearly indicating fair and reasonable grounds for so doing, and we think there can be no doubt that Dr. Austin fully understood and of her own volition agreed to the entire transaction.

Counsel for appellant also say that there was "fraud in the procurement of the transfer because the transferee, Unity School of Christianity, is a business corporation without power to carry out the charitable purposes alleged to have induced the transfer." Apart from the purely legal conclusion that the contract was null and void because of defendant's lack of such charter power, plaintiff merely pleaded that defendant's officers and agents, "well knew that it was without power or authority to enter into said contract, and fraudulently and deceitfully purported to assume obligations beyond and outside the corporate powers of said corporation." Even if this were a sufficient specification of fraud and plaintiff could question defendant's charter powers, which questions we need not consider in determining this case, this point would have to be ruled against appellant because we find no evidence of such alleged knowledge or fraudulent and deceitful representations.

The case was well tried and fairly ruled by the chancellor and the judgment is affirmed. All concur.