## T. A. NICHOLSON, Administrator, Respondent, v. MOLLIE DUFF, Appellant.

**Springfield Court of Appeals, March 20, 1915.**

1. **APPEAL AND ERROR: Equity Case: Trial Court's Opinion and Findings.** In an equity case the appellate court is not controlled by the opinion and findings of the trial court, though they are persuasive.

2. **GIFTS: Evidence.** Suit to cancel gift by assignment of a note from a mother to a daughter. Evidence reviewed.

3. ————: **Note Assigned to Daughter: What Mental Capacity Required.** Where an aged lady assigned a note to her daughter and contest thereon was made by the other children it was only necessary to show the mental capacity required for making a will to uphold the gift, cases of such character not demanding the mental capacity required in making contracts where judgment as to value is required.

4. ————: **Undue Influence: What Not: Presumptions.** Confidential relation or undue influence on the part of a daughter to a mother is not presumed because the daughter was taking care of the mother, and accompanied her to a bank where the mother procured a note which she afterwards assigned to such daughter at the office of a lawyer to which the daughter accompanied the mother.

5. ————: **Mental Capacity: Undue Influence: Gift Upheld.** Suit to cancel assignment of a note which a mother had given to her daughter. Evidence *held* to show that the mother had sufficient mental capacity to understand her act and that she was not improperly influenced by the daughter.

Appeal from Greene County Circuit Court.—*Hon. Arch A. Johnson*, Judge.

REVERSED AND REMANDED (*with directions*).

*C. O. Hamlin* and *Hamlin & Seawell* for appellant.

(1) There is no presumption against a voluntary conveyance from parent to child. The burden properly

rested upon the plaintiff to prove the exercise of some undue influence by defendant over plaintiff by which the gift was secured. Doherty v. Noble, 138 Mo. 25; McKinney v. Hensley, 74 Mo. 326, 332; Hatcher v. Hatcher, 139 Mo. 614, 624; Bonsal v. Randal, 192 Mo. 525, 532; McKissock v. Groom, 148 Mo. 459, 467; Campbell v. Carlisle, 162 Mo. 634; Jones v. Thomas, 218 Mo. 508. (2) Mrs. Galbraith was only required to possess the same mental capacity in making the assignment in this case as would have been required of her if she had made a will. It requires no more mental strength on the part of the grantor to give his property to his children by deed than it does for a devisor to give it to them by will—both stand upon the same foundation. Caldwell v. Reed, 198 Mo. 359; Richardson v. Smart, 152 Mo. 623; Jones v. Thomas, 218 Mo. 508; Moore v. Moore, 67 Mo. 192; Maddox v. Maddox, 114 Mo. 35. (3) The settled meaning of undue influence in this State is such influence ''as amounts to over-persuasion, coercion or force destroying the will-power of the testator. It is not merely the influence of affection, nor the desire of gratifying the wishes of one beloved or trusted by the testator.'' Gibbony v. Foster, 230 Mo. 106; Tibbe et al. v. Kamp et al., 154 Mo. 545. (4) If a person understands the nature of the business in which he is engaged and the effect of what he is doing, his acts are valid, and this is true though the mind of such person may be impaired by age or disease. Chadwell v. Reed, 198 Mo. 379; Cutler v. Zollinger, 117 Mo. 92.

*Patterson & Patterson* for respondent.

(1) The issue as to whether the note was procured by fraud, that is to say, by undue influence, is determined by the following considerations; the relationship of the parties, the character of the transaction, the mental condition of the grantor, and the ade-

quacy of the consideration. Jones' Exr. v. Belshe, 238 Mo. 539. (2) Wherever two persons stand in such a relation as that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of the position will not be permitted to retain the advantage, although the transaction could not have been impeached if no confidential relation existed. Jones' Exr. v. Belshe, 238 Mo. 540; Carnet v. Carnet, 248 Mo. 235-236; Parker v. Parker's Estate, 164 S. W. 648.

ROBERTSON, P. J.—On February 14, 1913, the plaintiff, as administrator of the estate of Francina Galbraith, deceased, brought this action against the defendant, daughter of said deceased, to cancel an assignment of a note for $3000 to the defendant. The said Francina Galbraith died February 4, 1913, at the age of seventy-five years. The assignment of the note was made August 30, 1912 and it is alleged "that on said date the said Francina Galbraith was residing with the defendant and was of unsound mind and incapable of attending to any ordinary business matter and was subject to the control and domination of the defendant; that on said date and without the payment of any consideration therefor, and by reason of the said Francina Galbraith's said mental incapacity and by reason of the defendant's wrongful domination and control over her said mother, the defendant procured the assignment and possession of the said $3000 note."

The trial court found the issues for the plaintiff, rendered judgment accordingly and the defendant has appealed. The trial judge made a finding of facts and, after reciting briefly some of the facts, concludes as follows:

189MA4

"I find that the note given by her to the defendant was practically all of the property of which the deceased was possessed at the date of the gift. I find that, continuously from May until the date of the transfer of the note, her mind was in a diseased and enfeebled condition and that, during a large part of this time, she was incapable of carrying on a connected conversation, but that she had lucid intervals or periods called by the witnesses 'good days' in which her mental condition was apparently and in fact much better than at others, and that the transfer of the note in question was made during one of these periods of apparently clear mental condition. Considering her condition and the relationship existing between herself and the defendant and all the circumstances in evidence, I hold that a confidential relationship existed between them, which raises a strong presumption that her act in transferring the note in question to the defendant was brought about by undue influence exercised over her by the defendant, and judgment will be for the plaintiff as prayed in the petition."

While in an equity suit the opinion and finding of facts of the trial judge are persuasive they are not controlling upon us and we must examine the testimony and reach a conclusion which we deem justified by the facts as we understand them and according to our view of the law governing the same. [Troll v. Spencer, 238 Mo. 81, 93, 141 S. W. 885.]

The deceased left surviving her several children, some living in Oklahoma and some in this State. The defendant and some of the other children live in Springfield. There were two inquests held in the probate court of Greene county upon the sanity and ability of the deceased to manage her affairs. The first one was in the first part of May, 1912, and was instituted by the defendant. The other one was in January, 1913, and was instituted by defendant's brother Tom.

The first one resulted in a finding of a jury that the deceased was of sound mind and capable of managing her affairs; the second one resulted in a negative verdict on these questions. The note in controversy and about $600 in money was with the Holland Banking Company of Springfield, and had been there a considerable time before this assignment. Some time after the first proceedings in the probate court Mrs. Galbraith went to visit with her childern in Oklahoma, but returned shortly before the assignment of the note to the defendant with whom she had previously been living and remained with her until the date of her death. Upon her return from Oklahoma she stated to numerous persons that she had become convinced that the defendant was the only one of her children who cared anything for her and that she had returned to spend the remainder of her days with her. While Mrs. Galbraith was in Oklahoma the defendant wrote two letters to her sister displaying interest in the whereabouts of this note and expressing her fear that Tom would succeed in getting and dissipating it and thereby leave her mother destitute. An officer of the Holland Banking Company was also a witness, and testified that he was continuously harassed by Tom with inquiries about his mother's property at the bank. There is nothing in our opinion in any of the testimony that discloses that the defendant had any mercenary motive in the concern which she displayed about her mother's property. We think that it is fairly deducible from the testimony that the defendant had no other object in view in the proceedings she instituted in the probate court than to place her mother's property so that it could not be dissipated by any of the other children whom she suspected were so inclined. The treatment which the mother received at the hands of her children in Oklahoma lend color to the belief that

she was not induced to go there on account of any filial love they had for her.

One of the sisters of the defendant testified that while the mother was in Oklahoma that she talked very little with her mother about business, because she "saw she didn't have mind enough to talk about it." The plaintiff in this case testified that he observed in November, 1912, in connection with some business being transacted, that Mrs. Galbraith's conduct was out of the ordinary.

A brother of the deceased, a man nearly eighty-three years of age, testified that in 1911 her memory began to fail, but he does testify that in 1912 the deceased visited his home by herself. He says that when he talked to her about this note she didn't know where the note was or anything about it, but he does not testify when this was. It is not contended by anyone that after Mrs. Galbraith fell in September, 1912, and received an injury that she was competent to transact business.

The father-in-law of defendant's brother Tom testified that in June, 1911, that he observed peculiarities about Mrs. Galbraith's mind in connection with a transaction then had.

Tom's wife testified for the plaintiff that Mrs. Galbraith never remembered about selling her farm in 1911 and that she didn't know whether Mrs. Galbraith was easily persuaded to do things or not. She testified that she had three children and absolutely refused to keep Mrs. Galbraith under any circumstances.

Tom was also a witness in plaintiff's behalf and testified in a general way to peculiar traits of his mother's mind which, although it is not made clear, it seems he claims took place in 1911.

A grandson of the deceased was also a witness for plaintiff and he testified to a conversation which he had and circumstances he observed, shortly after

Mrs. Galbraith returned from Oklahoma. The details of his observations discloses, as does the testimony of numerous other witnesses, that Mrs. Galbraith's mind was not at all times in 1912, as perfect as it had been.

Two other witnesses testified for the plaintiff who are not related to either side and one of them testified that he saw Mrs. Galbraith twice in 1912, once meeting her on the street and that she appeared to be lost, again that he met her on the street and that she recognized him, but that in a conversation she would apparently change the subject. This witness saw and talked with her frequently and gave it as his opinion that she was incapable of transacting business. The other witness testified that he visited an hour or two with deceased when she was in Oklahoma and he testified that she didn't seem to understand matters about which they were talking.

The physicians who testified at the first inquest in the probate court that in their opinion Mrs. Galbraith was mentally incapable of managing her affairs, were witnesses for the plaintiff in the trial of this case. They testified that they visited her and made the examination at that time at the request of the judge of the probate court, and that in their opinion she was afflicted with senile dementia, an affliction that rarely improves. It is what they designate as a progressive disease. Between the date of the first inquiry in the probate court and the second one Mrs. Galbraith fell, as above stated, and received an injury which very materially affected her general health; this, however, was after the assignment of the note.

The real facts, and the important ones, in connection with the transaction involved in this case, and about which there is no serious dispute, are that on the morning of the day when the transfer was made, Mrs. Galbraith and her daughter appeared at the bank

of the Holland Banking Company and stated that they wanted to get all of Mrs. Galbraith's papers. The cashier got them and went over them with the old lady, then wrote a receipt therefor, which Mrs. Galbraith signed. · Mrs. Galbraith stated to the cashier that she had been to Oklahoma but was dissatisfied, had come back home and was going to live with the defendant. At that time she said something about turning over something to her daughter and he told her that as he was not a lawyer she had better go to somebody else. The cashier testified that there was no question in his mind but that she knew what she was doing and that she discussed the different features about her different papers. Mrs. Galbraith and the defendant after leaving the bank went to the law office of Mr. Pepperdine where the defendant introduced her mother to him and after they were seated the defendant requested her mother to tell Mr. Pepperdine what she wanted to do. Mrs. Galbraith then said that she had been to Oklahoma, was glad to get back and that it looked to her like none of her children cared anything for her except the defendant and that she was "going to turn over what stuff" she had to her and she was going to take care of her. She then produced the note and Mr. Pepperdine explained to her that it was a note, how much it was for and asking her if she wanted to give it to the defendant, to which Mrs. Galbraith replied that she did. He then wrote the endorsement to the defendant on the note and Mrs. Galbraith undertook to sign her name thereto but her hand was shaking so that she could not, stating that she was tired from walking. He then wrote, after calling Mrs. Pollard as a witness, the name of Mrs. Galbraith to the assignment. The parties were in his office about ten minutes. Mrs. Pollard testified that Mr. Pepperdine asked Mrs. Galbraith three different times if it was her intention to give this note to Mrs. Duff to

which she replied each time that it was. One of defendant's neighbors testified that she was at defendant's home and Mrs. Galbraith told her that she had turned her papers over to defendant "to do as she pleased with, because the other children hadn't treated her right and she didn't want them to have any more of it if she could help it." Another neighbor testified that Mrs. Galbraith told her after return from Oklahoma that she was glad to get back; that she found out while she was away who wanted her and who didn't; that defendant had always been the best to her of any of her children; that she had come back to spend the rest of her life with defendant and while she was gone one of the children charged her $15 a month for board. At that time she also told this witness that she had given defendant all of her property.

One of the doctors who helped make the examination by request of the probate judge on the first inquest testified that he had treated the deceased from time to time for several years and that during the entire year of 1912 her mental condition was bad. When the examination was made they inquired of her about her business matters and particularly the mortgage securing the note involved in this suit and that she didn't know anything about her business, but later he testified that she recollected her mortgage, but didn't know the amount of it and on cross-examination he says that she told him that she owned this note and that it was secured by mortgage. The court after he had heard the testimony of other witnesses as to what they testified she actually did, recalled this doctor and submitted to him a hypothetical question based on some of those facts and then asked the doctor of his opinion, assuming those facts to be true, if her condition was better on the date the note was assigned than at the time when the examination was made in the probate court. The doctor testified that he did not

see that her condition was better. He said that there might be times when she absolutely understood her business as well as anybody and knew what she wanted to do. Both of the other doctors who were present at the examination testified that in their opinion the deceased was not competent to transact business. The court recalled one of these doctors and after stating to him that he had heard the questions propounded to the other doctor asked him what he would say about her mental condition or the possibility of her being in a mental condition to carry on that conversation and transact that business. Then continuing: "Do you believe it would be possible?" The doctor answered that it might be possible but not probable. Of course the answer to that question could result in nothing except to impeach the testimony of the witnesses who testified to what actually transpired. This doctor, however, went ahead to discuss the effects of senile dementia. The defendant introduced three physicians who, upon hypothetical questions propounded in a fuller and more comprehensive manner than by those submitted by the court, testified that in their opinion Mrs. Galbraith was competent to transact business. One of these doctors testified that a person can have senile dementia and yet be able to transact business. It is like any other affliction; it may be severe in some cases and in others less destructive of the memory and in some instances it may develop rapidly and in others progress slowly, although the general trend is for the worse.

The respondent, in answer to appellant's contentions for a reversal of the judgment in this case, defines the position which he takes to support the judgment as follows:

"The respondent does not contend that merely, 'The relationship of parent and child' raises 'the presumption of undue influence and casts the burden upon

the defendant,' or 'that acts of kindness' on the part of the daughter 'would raise such a presumption' or 'the fact that Mrs. Galbraith gave the daughter *the greater part of her estate'* would 'show undue influence or want of mental capacity.' Nor does the respondent contend that because Mrs. Galbraith resided with the defendant at the time of the assignment and because 'defendant went with her to the bank and to Mr. Pepperdine's office at the time of making the assignment alone are sufficient to show a relation of trust and confidence such as will defeat the assignment,' therefore we say that appellant's authorities which support these doctrines are beside the facts of this case.

"And as heretofore stated, the issue as to whether the note was procured by fraud, that is to say, by undue influence, is determined by the following considerations; the relationship of the parties, the character of the transaction, *the mental condition of the grantor,* and the adequacy of the consideration."

Involved in a case of the charter of the one at bar we have an instance where no more mental strength on the part of Mrs. Galbraith was required in assigning this note to defendant than if she had bequeathed it to her by will. Cases of this character do not demand the mental capacity that is required in making contracts where judgment as to value is required. [Jones v. Thomas, 218 Mo. 508, 538 and 539, 117 S. W. 1177.]

The facts that deceased had gone to Oklahoma, returned dissatisfied with all of her children, except defendant, expressed her appreciation of defendant's treatment of her and declared her intention to live with defendant during the remainder of her life, readily explain why the mother would naturally be inclined to give this note to defendant. [Turner v. Butler, 253 Mo. 202, 218, 161 S. W. 745.]

The competency of a party to dispose of property in cases of this kind is defined as follows:

"By competency is meant intelligence sufficient to understand the act he is performing, the property he possesses, the disposition he is making of it, and the persons or objects he makes the beneficiaries of his bounty. Imperfect memory, caused by sickness or old age, forgetfulness of the names of persons he has known, idle questions, or requiring a repetition of information, will not be sufficient to establish incompetency, if he has sufficient intelligence remaining to fulfill the above definition." [Southworth v. Southworth, 173 Mo. 59, 72, 73 S. W. 129; Bensberg v. Washington University, 251 Mo. 641, 658, 158 S. W. 330; Byrne v. Fulkerson, 254 Mo. 97, 120.]

The facts that defendant was caring for her mother, accompanied her to the bank and to Mr. Peppedine's office raise no presumption of a confidential relation or undue influence, as conceded by respondent. [Bonsal v. Randall, 192 Mo. 525, 531 and 532, 94 S. W. 475.]

The opinions on the questions involved here are numerous and voluminous, and we think it unnecessary to comment in detail on all respondent has cited. We think that many of them are of no material aid in a decision of this case for the reason that they involve instances where the relations of the parties were different than here and where a jury trial was had and the Supreme Court was discussing the sufficiency of the proof to take the issue to the jury. Certainly the general rules of law there announced must be followed by us, but the facts in any given case are the main features of it. We must decide this case on its peculiar facts, and what has been said in cases tried by a jury as to what raised an issue of fact can have little weight with us in arriving at the right result here.

We think there is no other conclusion justified in this case than that Mrs. Galbraith fully understood

what she was doing when she gave this note to the defendant. The testimony of the parties through whom this transaction was had and the testimony of her neighbors who stated that she spoke of it afterwards leads us clearly to that finding. We are also of the opinion, and so find, that the defendant exerted no improper influence over her. We think that in view of the fact that she had lived with defendant for years; that she had returned from Oklahoma where one of her children charged her board; the fact that Tom's wife "absolutely refused to keep her under any circumstances" and the fact that nowhere is it shown that defendant ever undertook to get this property for herself leads us to believe that Mrs. Galbraith intended, and wisely so, that this bounty should go to the only child that had manifested any particular interest in her welfare at a time in life when it was most needed. The note should remain where deceased in her wisdom, as we believe, placed it, and therefore, we reverse the judgment and remand the cause with directions to the trial court to dismiss plaintiff's petition and tax the costs against him. [Shelton v. Franklin, 224 Mo. 342, 368, 123 S. W. 1084.]

*Farrington, J.,* concurs; *Sturgis, J.,* dissents and thinks the judgment should be affirmed on the ground that the evidence, considering the impaired mind of the donor and the relationship of the parties, sustains the allegation of undue influence.