Clara FLYNN, Administratrix of the Estate of Anna M. Yorger, Deceased, Plaintiff-Respondent,

v.

UNION NATIONAL BANK OF SPRING-FIELD, Missouri, Defendant-Respondent,

and

Emma McReynolds, Defendant-Appellant.

No. 8220.

Springfield Court of Appeals.

Missouri.

April 14, 1964.

Motion for Rehearing or to Transfer Overruled May 4, 1964.

1

2

Bussell & Hough, Leland C. Bussell, Kelly & Church, W. Clark Kelly, Springfield, for defendant appellant.

Allen, Woolsey & Fisher, Russell G. Clark, Springfield, Ninian M. Edwards, Clayton, for plaintiff respondent.

PER CURIAM.

This is an appeal from a judgment declaring that title to a savings account is

vested in Clara Flynn, Administratrix of the Estate of Anna M. Yorger, deceased.

We have rendered an opinion in this case, Stone J., not sitting. Motion for rehearing was sustained and Honorable James C. McDowell, former judge of this court and now commissioner, sat with the court for reargument in place of Judge Stone. After hearing such argument and careful consideration we have come to the conclusion that the opinion was correct. Our opinion is as follows:

The original petition charged that Mrs. Yorger had nine thousand dollars in a savings account in her own name at the Union National Bank of Springfield; that on January 18, 1960, she transferred such account to a joint savings account in her name and the name of defendant (now appellant), Emma McReynolds; that at the time of such transfer Anna Yorger was incompetent and was not aware of the consequences of the change in the account. In an amended petition, filed by leave of court after most of the evidence was in, plaintiff also charged that there was a relationship of trust and confidence between Mrs. Yorger and defendant, Emma McReynolds, and also a confidential relationship between Mrs. Yorger and one Evans McReynolds (son of Emma McReynolds); and that the McReynoldses, mother and son, exercised undue influence over Mrs. Yorger in order to procure the transfer of such account.

The principal characters and some of the witnesses in this transaction are:

*Anna M. Yorger,* elderly wife of Gustave Yorger. This couple had lived at the same address in Springfield since the latter part of 1942 or early 1943. They were childless. We gather from the whole evidence that Mrs. Yorger was rather a dependent, nervous sort of person, tending toward being a hypochondriac, and that she relied upon her husband to make purchases and to control the financial affairs concerning the household.

Plaintiff's witness, *Dr. Fitch,* who was engaged in the general practice of medicine, had been Mrs. Yorger's physician off and on (with two years out) since 1951. He said he had treated Mrs. Yorger for symptoms of insomnia, restlessness, various aches and pains, and that she demanded new and different sedatives for sleep. For years, "Well, this poor old fellow, her husband, she had many imaginary ideas about his infidelity, and his mistreatment of her, and, actually, he was a very kind old person." How the doctor acquired possession of the knowledge that her ideas concerning her husband's infidelity were "imaginary" we do not know.

Next-door neighbor for twenty odd years was defendant, *Emma McReynolds.* Mrs. Yorger and Mrs. McReynolds had been "bosom friends" for a long time.

*Evans McReynolds* is the son of Emma McReynolds and was a friend of the Yorgers. He was a vice-president of the Union National Bank and was in charge of public relations, loans, investments, and advertising.

*Clara Flynn,* also elderly, was half-sister and nearest kin of Anna Yorger. Mrs. Flynn lived in St. Louis and, according to her testimony, had visited Anna Yorger every year.

*Gus Wesley Flynn,* son of Clara Flynn, lived in St. Clair. In former years he had visited Mrs. Yorger practically every year; but prior to the death of Gustave Yorger (he attended the funeral) he had not visited with her for two and one-half years. He had four children by his second marriage. Mrs. Yorger had never seen the three youngest.

On September 5, 1959, Gustave Yorger, Anna's husband, committed suicide by shooting himself. Clara, the half-sister, came down for the funeral and stayed with Anna for approximately three or four weeks. Some friction developed between the two half-sisters, and Clara went back to St. Louis. Produced in evidence was an

envelope and an enclosed paper writing, in ink, written by obviously shaky fingers. The envelope was entitled: "My Will Mrs Anna Yorger." The same writing on the paper inside the envelope was:

"Sunday Novembre 8/1959

"if any thing should happen to me sudenly dont dont let my half sister Clara Flyn take possession of my property give it to the probate court and Mrs Emma McRenold  She has been very kind to me and all so my Church Cambell Av Methodis Church  I am very nerves  I can scarcely writ my hand trembles

"Mrs Anna Yorger"

At sometime after the death of her husband, Mrs. Yorger engaged a realtor and sold her home.  So far as the record shows, she handled this transaction herself.  Evans McReynolds testified that she asked him to stop by her home and that she delivered the proceeds of the sale to him for deposit in the Union National Bank.  He deposited it in her checking account.

About November 12, 1959, Emma McReynolds went to the office of Mercy Villa, an establishment devoted to the care of elderly people, and made inquiry concerning possible admittance of Mrs. Yorger. The next day, Mrs. Yorger, accompanied by Mrs. McReynolds, went to Mercy Villa and inspected a room which Mrs. Yorger would have.  The following day, November 14, 1959, Mrs. Yorger, accompanied by Mrs. McReynolds, registered in at Mercy Villa. Mrs. Yorger herself furnished the information necessary for admission.  Inquiry was made of her concerning her relatives.  She informed the Sister in charge that she had a half-sister but she did not want the name of the half-sister placed on the admission sheet.  Listed on the admission sheet record following name, address, and doctor, was "Age 79—May 13th" (we do not know whether "Age" was calculated at the nearest birthday); "Religion Methodist"; "Responsible Self. (Neighbor: Mrs. S. L. Uhr.

Phone UN 6–5146 Mrs. McReynolds, Phone UN 4–4267" She was placed in the domiciliary or residence section, which is that portion where patients "pretty well take care of their own needs" and are free to come and go.  Sometime in November, about the 26th, Dr. Fitch saw Mrs. Yorger at Mercy Villa.  His report of physical examination was: head, ears, nose, throat, mouth, and lungs, "clear"; vision, "poor, cataracts"; heart and blood vessels, "Heart tones are clear and regular.  Arteries are sclerotic"; mentality, "nervous, emotional, orientated"; tentative diagnosis, "arteriosclerosis, neuro dermatitis."

From November 14, 1959, until the early part of January 1960, Mrs. Yorger visited in the office of Mercy Villa every day. She frequently made trips outside the Villa. During this period she went to the office of Dr. Fitch on three different occasions.  She made several trips to the Union National Bank.  These trips were made by cab.  On November 23, 1959, she deposited nine thousand dollars in a savings account at Union National.  Presumably this comprised the principal proceeds which had been derived from the sale of her home.

On or near January 9, 1960, Mrs. Yorger was transferred to the infirmary hospital section on the third floor of Mercy Villa. Sister Mary Phillipine, the administrator, testified, "I had thought for some time that she should be in the hospital section.  And we suspected at the time she was taking more medicine than necessary, and we called Dr. Fitch, and between the two us, we agreed to transfer her to the hospital section."

On or about January 17, or 18, 1960, the transfer of the savings account was made. This is the transaction here in question. The transfer was accomplished by the execution of a joint account depositors' contract card wherein "the undersigned, joint depositors," agreed that the account would be owned jointly and with right of survivorship.  It was signed by Anna M. Yorger

and Mrs. Emma McReynolds. Further reference will be made to this card.

In the latter part of January 1960, Mrs. Yorger's nephew, Gus Flynn, came to the infirmary to see her. On January 28, 1960, Betty Jane Flynn (wife of Gus Flynn) filed petition in probate court for appointment of guardian of the person and estate of Anna Yorger, age seventy-nine. Hearing was set for February 3, 1960, and notice was served on Mrs. Yorger on January 29. On February 10, Evans McReynolds was appointed guardian. Mrs. Yorger died September 5, 1960, exactly one year from the day her husband killed himself.

Turning to the negotiations concerning a will: On December 15, 1959, Mrs. Yorger phoned Mr. Powell, an attorney in Springfield, and requested that he come to Mercy Villa to talk about a will. He went there, but he does not recall how many days thereafter. He met her in a private visitors' room on the first floor, and they talked about an hour. She discussed with him various items of her assets which she wanted to dispose of in her will. She mentioned her church and that she had given a ring to Mrs. McReynolds. She stated that she did not want Clara Flynn to have any of her money. She mentioned the desire to leave some money to the children of Gus Flynn but was afraid their father, or Clara Flynn, would control it. Powell advised that she could leave the money for the children in charge of a trustee, and "she was pleased about this, because it changed her mind about what she was going to do about some of her property." Powell left. He prepared a will sometime later. He does not know how many days thereafter he took a draft of the will to her. On this occasion they discussed the will and she was satisfied with it. Powell then went to a Sister in charge of the ward for witnesses and told her he was going to have Mrs. Yorger execute a will. The Sister inquired as to whether or not the Union National Bank knew about it. "I told her that so far as—that they did not. And she

said that she would prefer that I contact the Union National Bank and let them know about it before Mrs. Yorger should sign." Powell went back to his office and on some later date (he does not recall when), he called the bank and contacted Evans McReynolds and told him what the Sister had said. He testified that McReynolds said, " * * * 'Well, we have no control—' * * *. 'It is none of our business, but,' he said, 'if it will help you out I will go with you or call them.' * *." But they were unable to arrange a time and Powell apparently did not get back to Mercy Villa until in the evening of January 27, or 28. On that occasion Mrs. Yorger was in bed and not feeling well. He testified it was his opinion that on the previous visits and consultations with her she had testamentary capacity, but on this last occasion he thought she was different and did not have testamentary capacity, and he did not ask her to sign the will. The unexecuted will, so prepared by Powell, is too long to set forth here, but the substance is as follows: to Clara Flynn, one dollar; to the Campbell Avenue Methodist Church, five hundred dollars; "to Mrs. D. E. McReynolds, my diamond ring and any other personal effects that I may have left in her care. Actually, these items were given to her by me, but I desire that no question arise in this regard"; the balance of her estate to the Union National Bank in trust for the children of Gustave J. Yorger Flynn, with certain directions as to use of the funds for education and a provision for termination of the trust and for final distribution when the youngest of the beneficiaries reaches the age of twenty-one.

During the whole of the period with which we are concerned, Mrs. Yorger had visits from neighbors and ex-neighbors, but the most consistent visitor was Mrs. McReynolds. She was at the infirmary from three to four times a week. On these occasions she would usually bring some little article, knickknack, or special article of food. She also carried out and attended to Mrs. Yorger's personal laundry. Upon oc-

casions Mrs. Yorger would have a nurse phone Mrs. McReynolds simply to come over and talk with her.

There is no contention here that the transfer was not actually effected. The questions presented are: (a) whether or not Mrs. Yorger had sufficient mental capacity to make the gift, and (b) whether it was procured by the exercise of undue influence.

*Did Mrs. Yorger have sufficient mental capacity?* Dr. Fitch, her personal physician, saw her at Mercy Villa on November 26, 1959, at his office on November 30, 1959, December 8, 1959, and January 4, 1960, and again at Mercy. Villa on January 9 and January 26, 1960. He testified that there was no time between November 30, 1959, and February 4, 1960, when Anna Yorger was not "incompetent." She "needed somebody to manage her business." He said she was nervous, an "emotional problem—mental problem." She had cerebral arteriosclerosis, commonly referred to as senility, which was a progressive condition. She was suffering from simple senile deterioration. In the beginning of this deterioration, there are long periods of lucidity. Terminally there are not. She was not devoid of memory. She was oriented and always recognized him and could always give her complaints. Nevertheless, she was incompetent. He related one instance, when being in her room, of seeing some money on her bed and some in a shoe.

We have some difficulty in interpreting the doctor's testimony in respect to just what he meant by "incompetency." Mental capacity to make a gift is a mixed question of law and fact. The mental capacity required by the law to make a gift and the capacity which distinguishes the competent from the incompetent in a medical sense is not always the same.[1] It is held that the capacity required to make a gift is not as high or acute as the capacity to engage in a business or arm's length transaction where each party thereto is engaged in getting an advantage to himself, instead of the simple satisfaction in having benefited one who is near and dear.[2] Usually it is said that the requirements for making a gift inter vivos are the same as those required to make a will. McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698, 703; Nicholson v. Duff, 189 Mo.App. 47, 174 S.W. 451, 454. The requirements generally listed are: the capacity to know and understand, in a reasonable manner, the nature and effect or consequences of the act involved; a reasonable understanding of the nature and extent of the giver's property and effects; and an understanding as to who are the natural objects of the giver's bounty. 38 C.J.S. Gifts § 13, p. 789; Walton v. Van Camp, supra; Ahmann v. Elmore, supra; Jeude v. Eiben, 338 Mo. 373, 89 S.W.2d 960, 969; Lastofka v. Lastofka, supra.

The doctor did not say that in his opinion Mrs. Yorger had no understanding concerning business affairs or transactions. He did say that he thought "she needed somebody to direct her business," "primarily, to look after her money." He did say that she was oriented as to time and place and that she always knew him. His testimony indicates that he never saw her except when she was having some "undue trouble or symptom." Perhaps it should be interpreted to mean that she was incapable of looking after her business. Yet there are many people who for one reason or another are not able to, even capable of, looking after their business affairs in some respects, and yet they are not of such un-

---

1. Dowling v. Luisetti, 351 Mo. 514, 173 S.W.2d 381, 385, 386; see Ahmann v. v. Elmore, Mo., 211 S.W.2d 480, 487; Clark v. Leonard, Mo., 232 S.W.2d 474, 480; Hall v. Mercantile Trust Co., 332 Mo. 802, 59 S.W.2d 664.

2. Cruwell v. Vaughn, Mo., 353 S.W.2d 616, 624; Hedrick v. Hedrick, 350 Mo. 716, 168 S.W.2d 69, 74; Lastofka v. Lastofka, 339 Mo. 770, 99 S.W.2d 46; Walton v. Van Camp, Mo., 283 S.W.2d 493; Shaw v. Butler, Mo., 78 S.W.2d 420; Curtis v. Alexander, Mo., 257 S.W. 432.

sound mind as renders them legally incapable of making a gift. (See cases under footnotes numbered 4, 5, and 6.)

■ Our evaluation of the doctor's testimony is further complicated by the fact that, upon cross-examination, he gave *some* indication that his decision that she was incompetent was based not only upon what he saw but also upon what the Sisters and nurses told him.

"Q. Dr. Fitch, the opinion that you are about to state, if you decide to state an opinion, is that based on your conversations with Sister Philippine and your conversations with the nurses, and their reports that they made on Mrs. Yorger while she was in the hospital, and your personal observations, all three of those things combined?

"A. I think that all three of them fit in, yes."

Of course, any opinion the doctor had which was based upon his observation was competent, as would also be an opinion in answer to a hypothetical question based on facts in evidence. But an opinion of the doctor based upon things others told him and facts not in evidence would be of no probative value.[3] To hold otherwise would delegate the orderly procedures and investigative process of our judicial system to a determination made on unsworn, hearsay statements. We will, however, from the doctor's whole testimony, consider its probative effect as being his opinion, as her physician, that the donor was "incompetent" in the sense that she was mentally incapable of managing her business affairs.

Gus Flynn, the nephew, testified that he had not received any word from Mrs. Yorger at Christmas nor an answer to his letters. He called a neighbor who informed him that she was in Mercy Villa. He came to Springfield in December 1959. He said that she didn't recognize him at first when he went to her room. "She says, 'Who is that?' And she had a scarf tied around her head and everything, I says, 'It is Gus, Aunt Anna." And then she recognized me." She asked him, " 'Oh, when did you get up here?' " Then she told him about her husband's suicide and about the funeral, which he had attended. Her conversation was "generally all muddled up; she didn't stay with any particular trend of thought." She inquired concerning his children and their ages. She asked him about his business. Then she went back to her husband's death. Then she "related back to" other times and then she went back to inquiry concerning his wife and children, although his wife was present. He saw Mrs. Yorger again sometime in late January, shortly before the guardianship proceedings were instituted, and he said his conversation with her was relatively a repetition of the conversation in December. He testified he believed that she was incompetent at the times he saw her.

All of the evidence indicates that Mrs. Yorger sometimes had "bad" days; that she sometimes was restless, depressed, crying, and reliving the circumstances of her husbands' death and funeral, which bore heavily upon her. There is some indication that, at least upon occasions, the lady took too much medicine. Among her medicines, chloral hydrate appears on the nurses' daily records. On one occasion she misplaced her money (by leaving it in the bathroom). On another occasion, when the doctor attended her, he said "the twenty-dollar bills were laying one in her shoe and one on the side of her bed."

3. Hornberger v. St. Louis Public Service Co., Mo., 353 S.W.2d 635; Hayes v. Equitable Life Assur. Soc. of United States, 235 Mo.App. 1261, 150 S.W.2d 1113, 1118; Baumhoer v. McLaughlin, Mo.App., 205 S.W.2d 274; Oesterle v. Kroger Grocery & Baking Co., 346 Mo. 321, 141 S.W.2d 780; Huffman v. Terminal R. Ass'n of St. Louis, Mo., 281 S.W.2d 863.

On the other hand, Mrs. Yorger had the liberty to visit other patients and did so.

The nurses' daily records for January 16, 17, and 18 show as follows:

"1/16/60 Routine AM care given. Up and about at liberty. Goes to bathroom alone. Ate a good breakfast and lunch. Condition appears to be good. Gave Purodigin at 8 AM.

"L. Wright L.P.N.

"1/17/60 Purodigin given at 8 AM. Routine AM care given, up and about at liberty. Ate well today. Goes to bathroom when needed. Condition appears to be good.

"L. Wright L.P.N.

"1/18/60 Purodigin given at 8 AM. Complete AM care given, up and out in hall. Goes back to room at liberty. Ate a good breakfast and lunch. Condition appears to be good.

"L. Wright L.P.N."

She "had a neat tray," attended to her own bathroom wants, bought small articles off the hospital cart and paid for them, bought the newspaper from the paper boy, read it, and frequently discussed current events and articles concerning some acquaintance. Nurses, neighbors, and ex-neighbors who visited her during the period involved (up to January 18, the date shown on the card) described her as a "rational," "cooperative," "oriented" person, who carried on "intelligent conversations," was "cognizant of her needs" and "responsive to statements and questions," and was "never quarrelsome or antagonistic." These witnesses testified that "she was competent to know what she wanted to do with what belonged to her" and that "she knew what she was doing." Sister Mary Phillipine said: "I do not claim to be able to say whether she was competent or not; the only thing I can say is, that she consistently knew who she was, where she was, how much money she had and who she wanted to have it." (This last statement was stricken by the court.) The same witness testified that when Mrs. Yorger was in the hospital section "she repeatedly told me, and consistently said so, too, that she had nine thousand dollars and a diamond bracelet she wanted Mrs. McReynolds to have. She also mentioned that she had other monies." She said that Mrs. Yorger made those statements on several occasions. Louise Wright, a nurse, testified that in the early part of January 1960, Mrs. Yorger "had admired a ring of mine, and said she was going to leave a ring to Mrs. McReynolds and a large sum of money. But she did not say how much money or what the ring was or anything about that." Mrs. McReynolds was not present.

In order to set aside a transfer upon the ground of mental capacity, it must be shown that the incapacity existed *at the time of the act which is in question.* "Spotty" occasions of mental incapacity occurring at intervals do not necessarily prove incapacity at the time the act was done.[4] It is true that evidence of the donor's condition at near times before and after the incident is competent, although the probative value of such evidence is somewhat dependent upon the nature of the illness or incapacity, especially in regard to per-

4. 38 C.J.S. Gifts § 13, p. 789; Cruwell v. Vaughn, supra, Mo., 353 S.W.2d 616, 625; Smith v. Fitzjohn, 354 Mo. 137, 188 S.W. 2d 832, 833; Schoenhoff v. Haering, 327 Mo. 837, 38 S.W.2d 1011; Forbis v. Forbis, Mo.App., 274 S.W.2d 800; Huffnagle v. Pauley, Mo., 219 S.W. 373; McCoy v. McCoy, supra; Dowling v. Luisetti, supra.

manency.[5] But weaknesses and diseases incident to old age are not necessarily inconsistent with sanity. Merely to show that one suffers from senility, confusion, or forgetfulness, or is possessed of a mental weakness, is not enough to avoid a gift, although these are factors to be considered. One must go further and show that *the donor did not possess sufficient mind to understand, in a reasonable manner, the nature and effect of the act in which she was engaged.*[6] We believe that the evidence is insufficient to show that Anna Yorger was of legally unsound mind at the time the transfer was made. On the other hand, we believe it does show that, with the exception of some periods or occasions, she was capable of understanding in a reasonable manner the nature of the transaction and that she reasonably knew and understood the nature and extent of her property and was cognizant of those who might be expected to be the objects of her bounty, and she did not desire that her nearest kin receive anything from her.

*Does the evidence show undue influence?* In cases such as this, where the lips of the donor are sealed by death and the lips of the donee are sealed by the dead man's statute and the facts can often be arrived at only by the drawing of inferences from the circumstances, the evidence must necessarily take a wide range. It did so in this case.

The transfer herein questioned was made by signing a printed form joint account depositors' contract card which contained a provision for joint ownership and survivorship. This card bore the stamped legends: "SAVINGS DEPT." and JAN 18 1960."

First appeared the signature of Anna M. Yorger. Beneath that was the signature of Mrs. Emma McReynolds. Typed on the card was the address, "c/o Mercy Hospital," and under "INITIAL DEPOSIT" was the figure "$9,000.00." Under "ACCOUNT OPENED BY" was "EMcR." On the reverse side was typed at the bottom, "To make Savings Account #16602 Jointt [sic] with Mrs. McReynolds. Account opened Nov. 23, 1959, $9000.00 check 80–8. E McR. Elderly lady, recently sold home." The only testimony concerning this joint account card was from Evans McReynolds. He said he was not at the bank when the transfer to joint account was made. He first saw the card in possession of his mother, Emma, at her home. The card at that time bore the signature of Anna Yorger. His mother asked him where she should sign it. She had difficulty in seeing, and he penciled her name at the right of the place for signature on the card, and she then signed it. He was going out of town and the card was mailed to the bank. The typewritten memoranda on the card was not made by him and was not on the card when he saw it in his mother's possession. He stated that when a new card is "picked up" a notation is made as to the purpose at the bottom of the card, and that part is torn off and put in the bank files (the card in evidence indicates a tear perforation at the bottom) in order to check against the card when it is returned to the bank. Memoranda as to the original savings account, identification, purpose, who opened it, et cetera, are transferred to the new account card from the old account card. None of this was done by him or in his presence. He assumes this was done by the new account clerk.

5. Glover v. Bruce, Mo., 265 S.W.2d 346; Detrich v. Mercantile Trust Co., Mo., 292 S.W.2d 300, 303; Gaugh v. Webster, Mo., 297 S.W.2d 444; Walter v. Alt, 348 Mo. 53, 152 S.W.2d 135; Fendler v. Roy, 331 Mo. 1083, 58 S.W.2d 459; Schoenhoff v. Haering, supra; Smith v. Fitzjohn, supra.

6. Wright v. Stevens, Mo., 246 S.W.2d 817; In re Nelson's Estate, Mo.App., 185 S.W. 2d 890; Lee v. Ullery, 346 Mo. 236, 140 S.W.2d 5; see Weakley v. Weakley, 355 Mo. 882, 198 S.W.2d 699; Pickett v. Cooper, 354 Mo. 910, 192 S.W.2d 412; McCoy v. McCoy, supra; Jeude v. Eiben, supra; Ahmann v. Elmore, supra; Hall v. Mercantile Trust Co., supra.

The burden of proving undue influence is upon the party asserting it.[7] But it is frequently stated that when one bestows a gift upon another who stands in the relationship of trust and confidence, then the gift is presumptively void and the burden is on the donee to rebut this by showing absolute fairness and validity of the gift and that such gift is entirely free from the taint of undue influence.[8] Other cases state that, when the confidential relationship exists, a "legal presumption of fact" that the gift was obtained by undue influence arises *if there are facts and circumstances from which such undue influence may be inferred.* Walton v. Van Camp, supra; Key v. Kilburn, Mo., 228 S.W.2d 731; .Lastofka v. Lastofka, supra. But the presumption does *not* arise solely because a position of·trust exists, nor can it be imposed simply because an opportunity for the exercise of undue influence exists, or out of suspicion or forced inference.[9] A majority of the cases narrow the origin of the presumption by stating that such presumption will arise when it can be found or inferred that the person standing in a position of trust and confidence was *active in procuring the transfer.*[10] In any event the presumption of fact is only such as to·make a prima facie case, an is-sue of fact. It can be rebutted, and the whole facts are to be considered in determining whether undue influence actually existed.[11]

Following the expressions above made, it would necessarily seem that, in order to avoid a gift because of undue influence, the evidence must be such as to justify the inference that influence was actually exercised and operative *at the time* of the transfer; that the influence was "undue" and not just "reasonable" persuasion, but such an influence as amounts to overpersuasion which wrongly deprived a donor of his or her free will and agency and substituted instead the actual will of the person who has dominance.[12]

As to whether a confidential relationship existed between Emma McReynolds and Anna Yorger sufficient to raise a presumption: A confidential relationship cannot be exactly defined. It is easy to say that it exists in the case of attorney and client, physician and patient, principal and agent, and priest and penitent; but, when we get into the realm of friendship and neighborliness, it begins to shade from black to gray to white. The best we can say is that the confidential relationship must be one where there exists a *special*

7. Klaber v. Unity School of Christianity, 330 Mo. 854, 51 S.W.2d 30; Sebree v. Rosen, Mo., 349 S.W.2d 865; Early v. Koelbel, Mo., 273 S.W.2d 312; Hamilton v. Steininger, 350 Mo. 698, 168 S.W.2d 59.

8. In re Patterson's Estate, Mo., 348 S.W. 2d 6; In re Kaimann's Estate, 360 Mo. 544, 229 S.W.2d 527, 530; Heflin v. Fullington, Mo., 37 S.W.2d 931; Reed v. Carroll, 82 Mo.App. 102; Hall v. Knappenberger, 97 Mo. 509, 11 S.W. 239; Moll v. Pollack, 319 Mo. 744, 8 S.W.2d 38, 45; Klaber v. Unity School of Christianity, supra.

9. Michaelson v. Wolf, 364 Mo. 356, 261 S.W.2d 918; Ulrich v. Zimmerman, 349 Mo. 772, 163 S.W.2d 567; Horn v. Owens, Mo., 171 S.W.2d 585; Sebree v. Rosen, supra; McCoy v. McCoy, supra; Key v. Kilburn, supra; Walton v. Van Camp, supra; Lastofka v. Lastofka, supra.

10. Wilhoit v. Fite, Mo., 341 S.W.2d 806; Cuthbert v. Heidsieck, Mo., 364 S.W.2d 583; Clark v. Powell, 351 Mo. 1121, 175 S.W.2d 842, 846; Been v. Jolly, Mo., 247 S.W.2d 840; Houghton v. West, Mo., 305 S.W.2d 407, 412; Sullivan v. Winer, Mo., 310 S.W.2d 917; Wright v. Stevens, supra; Michaelson v. Wolf, supra.

11. Nelson v. Hammett, Mo., 189 S.W.2d 238; Moll v. Pollack, supra; Been v. Jolly, supra; Klaber v. Unity School of Christianity, supra; Cuthbert v. Heidsieck, supra; Early v. Koelbel, supra.

12. McGirl v. Wiltz, Mo.App., 148 S.W.2d 822; Krummenacher v. Easton-Taylor Trust Co., Mo.App., 306 S.W.2d 593; Huffnagle v. Pauley, supra; Sebree v. Rosen, supra; Ulrich v. Zimmerman, supra; McCoy v. McCoy, supra; Wilhoit v. Fite, supra; Gaugh v. Webster, supra; Horn v. Owens, supra; Shaw v. Butler, supra.

trust and reliance which involves some fiduciary obligation on the part of the person so trusted, although it need not be a strictly technical fiduciary relationship. Usually the trust arises in a reliance upon another in regard to the handling of property and business affairs.[13]

Mental capacity and undue influence are somewhat intertwined. Both involve a state of mind, and for that reason feebleness and infirmity of intellect are facts to be considered in whether or not undue influence exists. Holland v. Anderson, Mo., 196 S.W.2d 175; Klaber v. Unity School of Christianity, supra; Huffnagle v. Pauley, supra; Moll v. Pollack, supra; Hamilton v. Steininger, supra.

It is fairly well settled that a trust, strong affection, or a good feeling which one ordinarily reposes in a close, personal friend or relative, or in gratitude for the kind acts of a good neighbor, is not ordinarily the confidential relationship with which we are dealing.[14] We find nothing in the relationship between Mrs. Yorger and Mrs. McReynolds, prior to the transaction, which speaks any more than kind acts, friendly attention, and good neighborliness. In almost every neighborhood there is a good neighbor who lends his or her assistance to those who are beset and in trouble. If we are to say that these simple acts of neighborly kindness and friendship are to be damned with the suspicion created by a presumption of undue influence, then we are indeed living in a harsh society.

Undue influence can be exercised by a party other than the beneficiary. Curtis v. Alexander, supra. The question of whether a confidential relationship existed between Evans McReynolds and Mrs. Yorger raises a more difficult question. The following facts stand somewhat to justify such an in-

ference: He was the son of a next-door neighbor and obviously a friend. There is some evidence, albeit rather sketchy and insubstantial, that McReynolds helped Mrs. Yorger with filling out the application for her insurance and possibly in settling up the expenses incident to her husband's funeral. There is also the fact that, at her request, he took the proceeds of the sale of her house to the bank and deposited them for her. (Apparently, however, he had nothing to do with the sale of the house.) These facts alone we think do not establish a confidential relationship which might justify a presumption. There are the additional facts that, after her husband's death and *prior* to the time Mrs. Yorger was transferred to the hospital section of Mercy Villa on January 9, 1960, she made several trips to the Union National Bank. McReynolds frankly says that she always came to his desk and he was her confidant. She did not, so far as he knew, know anyone else at the bank. She asked him how to apply the money in her checking account so that it would draw interest, and he advised her to put it in a savings account, which she did. He assisted her in opening this original savings account in her own name. He did not advise her on any other financial matters. He said that once she asked him about disposing of her property and ". . . I told her that if she knew how she wanted to dispose of it, to see an attorney and have a will drawn. I did not name any specific attorney." Mrs. Yorger was in the habit of withdrawing and carrying with her sums in excess of one hundred dollars; and, on at least one occasion, he talked her out of this. There is the additional fact, if it is to be considered, that when attorney Powell went to have the will executed, at a time when he felt that she had mental capacity to do so (and no one questions that Powell is not a

---

13. Clark v. Leonard, supra; Shaw v. Butler, supra; Jeude v. Eiben, supra; Hedrick v. Hedrick, supra; Hamilton v. Steininger, supra; Walton v. Van Camp, supra; Klaber v. Unity School of Christianity, supra.

14. 38 C.J.S. Gifts § 34, p. 813; Rich v. Baer, 361 Mo. 1048, 238 S.W.2d 408; Glover v. Bruce, supra; Jeude v. Eiben, supra; McCoy v. McCoy, supra; Nicholson v. Duff, supra; Been v. Jolly, supra; Reed v. Carroll, supra.

capable, experienced, and ethical lawyer), *someone* (by what authority and for what purpose we know not) interfered by "suggesting" that the Union National Bank be first contacted.

. On the reverse side of the ledger is the fact that McReynolds had no agency, power of attorney, or authority to withdraw or manage any of her funds. It develops that Mrs. Yorger had substantial sums on deposit in two other (savings) institutions in Springfield. Yet, he says (and there is no proof to the contrary) that he did not know enough about her affairs to be aware of this fact. His advice to her was limited to the deposit which was in the Union National Bank, and all that we can find that he did in respect to this deposit was to advise her to put it on interest.

■ But we think it is not necessary to decide whether a confidential relationship existed between Evans McReynolds and Anna Yorger, because, so far as the evidence shows, there appears to have been no contact between the two from sometime before (how long before is not clear) she was transferred from the "domiciliary" section to the hospital section on January 9 until the time the transfer to the joint account was made on or near to January 18. It appears that Mrs. Yorger. did not leave the hospital after January 9. It could be inferred that McReynolds had visited Mrs. Yorger at *sometime* prior to the time her nephew came to see her in December, because his card had been left at the office prior to the nephew's visit, but just when this was we do not know. There is *no evidence* that McReynolds ever visited her or had any contact with her after she was transferred to the hospital infirmary section on January 9. If the relationship between the two can be construed as a confidential one in the degree which would create the presumption, the evidence does not indicate that he had ,such an overpowering influence as would justify the inference of

control over Mrs. Yorger's mind without any contact over that long a period. It is not the existence of the influence but the exercise of it which avoids the transaction. Glover v. Bruce, supra; Walter v. Alt, supra. So far as the evidence shows, the "activity" of Evans McReynolds in helping his mother sign the card was not an "activity" associated with the donor in such a manner as would have any bearing upon Mrs. Yorger's exercising her own free will in executing the card, but was an "activity" after she had already signed the card.

We confess some misgivings in respect to the absence of more explicit evidence concerning the joint account card. There is no evidene to indicate whether Mrs. Yorger had secured this card before she was transferred to the hospital section or whether someone else secured it for her later; *but absence of evidence in a case where some of the witnesses are barred by the dead man's statute is not necessarily evidence in favor of plaintiff.* We also have some misgivings as to the conduct of the person who interfered with the signing of the will, although the will itself, if executed, would not have changed the course of the title to the deposit; but, as stated heretofore, we cannot infer undue influence from mere suspicion or opportunity.

While there are no two cases exactly alike, in our examination of the authorities cited and those found in our independent research, we find a number which are somewhat similar to this case on the facts, some of them apparently more favorable to the respondent than those in the instant case. We are impressed by the reluctance of the courts to interfere with the right of a person to transfer his or her own property.

■ It appears to us, that on the weight, of the evidence (a) Mrs. Yorger, on her own account, had no desire to leave anything to her half-sister and (b) she, on her

own account, really wanted to give to her friend, Mrs. McReynolds. The law does not look sourly on the exclusion of collateral relatives. Curtis v. Alexander, supra.

For the foregoing reasons we believe that we must reverse the judgment of the circuit court and hold that title to the joint savings account is in Emma Mc-Reynolds. The cause is, therefore, reversed and remanded with directions to the circuit court to enter judgment in conformity with this opinion.

All concur.

STONE, J., not participating.